Sean T. Malone OSB # 084060
Attorney at Law
259 E. 5th Ave, Suite 200-G
Eugene, OR 97401
Tel. (303) 859-0403
Fax. (650) 471-7366
seanmalone8@hotmail.com

Marianne Dugan (OSB # 93256)
Attorney at Law
259 E. 5th Ave., Ste 200-D
Eugene, OR 97401
Tel. (541) 338-7072
Fax. (866) 650-5213
mdugan@mdugan.com

Of Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| SODA MOUNTAIN WILDERNESS COUNCIL; OREGON WILD; KLAMATH SISKIYOU WILDLANDS CENTER; CENTER FOR BIOLOGICAL DIVERSITY; and CASCADIA WILDLANDS, | **No. 1:12-cv-01171** |
| v. | MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY PENDING APPEAL |
| UNITED STATES BUREAU OF LAND MANAGEMENT | |
| Defendant, | |
| MURPHY COMPANY, | |
| Defendant-Intervenor. | |

i – Memorandum in Support of Plaintiffs'
Motion for Stay Pending Appeal

## Table of Contents

Table of Contents ............................................................................................................. ii

INTRODUCTION ............................................................................................................ 1

STANDARD OF REVIEW ............................................................................................. 2

ARGUMENT .................................................................................................................... 4

I.    Plaintiff Raises Serious Questions and is Likely to Succeed on the Merits of its Appeal.... 4

A.    Plaintiffs raise serious questions and is likely to succeed on its claim under the Federal Lands Policy and Management Act ...................................................................................... 4

1.    The Cottonwood timber sale threatens the destruction, modification, or curtailment of the fisher's habitat and range ........................................................................................ 5

i.    Timber harvest and fuels reduction .......................................................................... 6

a.    Timber harvest and fuels reduction will reduce fisher prey .................................. 6

b.    Timber harvest and fuels reduction will reduce canopy closure .......................... 7

ii.    Road construction and reconstruction ..................................................................... 8

iii.    The Cottonwood timber sale fails to contribute to the recovery of the Pacific fisher 9

B.    Plaintiffs raise serious questions and are likely to succeed on their claim that the BLM failed to take a hard look at logging old-growth infected mistletoe ........................................ 9

C.    Plaintiff raises serious questions and is likely to succeed on their claim that the BLM failed to consider a reasonable range of alternatives ............................................................ 16

III.    Plaintiffs have suffered and will suffer irreparable harm absent a stay .......................... 17

IV.    The Balance of Equities Tips Sharply in Favor of Plaintiffs and a Stay Pending Appeal is in the Public Interest ...................................................................................................... 20

CONCLUSION ................................................................................................................ 23

Table of Authorities

**Cases**

*Alliance for Wild Rockies v. Cottrell*,
  622 F.3d 1045 (9th Cir. 2010) ........................................................................ 3

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ....................................................................................... 4

*Barnes v. U.S. Dep't of Transp.*,
  655 F.3d 1124 (9th Cir. 2011) ..................................................................... 15

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ..................................................................... 18

*Californai v. Block*,
  690 F.2d 753 (9th Cir. 1982) ....................................................................... 16

*Citizen's Alert Regarding Environment v. U.S. Dep't of Justice*,
  1995 WL 748246 (D.D.C. 1995) ................................................................ 22

*Citizens for a Better Henderson v. Hodel*,
  768 F.2d 1051 (9th Cir. 1985) ..................................................................... 16

*Ctr. for Biological Diversity v. Nat'l Hwy Traffic Safety Admin.*,
  538 F.3d 1172, 1217 (9th Cir. 2008) ........................................................... 16

*Earth Island Inst. v. U.S. Forest Serv.*,
  442 F.3d 1147 (9th Cir. 2006) ..................................................................... 11

*Earth Island Institute v. U.S.*
  351 F.3d 1291 (9th Cir. 2003) ....................................................................... 3

*Fund for Animals v. Lujan*,
  962 F.2d 1391 (9th Cir. 1992) ....................................................................... 3

*Griggs v. Provident Consumer Discount Co.*,
  459 U.S. 56 (1982) ......................................................................................... 2

*Idaho Conservation League v. Mumma*,
  956 F.2d 1508 (9th Cir. 1992) ..................................................................... 16

*Kern v. BLM*,
  284 F.3d 1062 (9th Cir. 2002) ....................................................................... 7

*Kootenai Tribe of Idaho v. Veneman*,
  313 F.3d 1094, 1120 (9th Cir. 2002) ........................................................... 16

*Lands Council v. Martin*,
  479 F.3d 636, 643 (9th Cir. 2007) ........................................................... 5, 17

*Lands Council v. Martin*,
  529 F.3d 1219 (9th Cir. 2008) ..................................................................... 20

*Lands Council v. McNair*,
  537 F.3d 987 (9th Cir 2008) ..................................................................... 4, 20

*Lopez v. Heckler*,
  713 F.2d 1432 (9th Cir. 1983) ....................................................................... 2

*Los Angeles Mem. Coliseum v. National Football League*,
  634 F.2d 1197 (9th Cir. 1980) ................................................................. 3, 22

*Masalosalo v. Stonewall Ins. Co.*,
  718 F.2d 955 (9th Cir. 1983) ......................................................................... 2

*Nat. Wildlife Federation v. Coston,*
  773 F.2d 1513 (9th Cir. 1985) ............................................................... 4
*Nat'l Parks Conservation Ass'n v. Babbitt,*
  241 F.3d 722 (9th Cir. 2001) ............................................................... 14
*Native Ecosystems Council v. U.S. Forest Serv.,*
  428 F.3d 1233 (9th Cir. 2005) ....................................................... 11, 16
*Natural Res. Def. Council v. Southwest Marine, Inc.,*
  242 F.3d 1163 (9th Cir. 2001) ............................................................... 2
*Natural Resources Defense Council v. Southwest Marine, Inc.,*
  242 F.3d 1163 (9th Cir. 2001) ............................................................... 2
*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
  137 F.3d 1372 (9th Cir. 1998) ............................................................. 14
*Newton v. Consolidated Gas Co.,*
  258 U.S. 165 (1922) ............................................................................... 2
*Northern Cheyenne Tribe v. Hodel,*
  851 F.2d 1152 (9th Cir. 1988), *rev'd on other grounds,* 918 F.2d 813 (9th Cir. 1990) ............. 22
*Northwest Coalition for Alternatives to Pesticides v. Lyng,*
  673 F. Supp. 1019 (D. Or. 1987) ........................................................... 2
*Oregon Natural Res. Council Fund v. Brong,*
  492 F.3d 1120 (9th Cir. 2007) ............................................................. 12
*Republic of the Philippines v. Marcos,*
  862 F.2d 1355 (9th Cir. 1988) ............................................................... 3
*Sampson v. Murray,*
  415 U.S. 61 (1974) ............................................................................... 22
*Seattle Audubon Soc'y v. Evans,*
  771 F.Supp. 1081 (W.D. Wash. 1991) ............................................ 22, 23
*Sierra Forest Legacy v. Rey,*
  577 F.3d 1015 (9th Cir. 2009) ............................................................... 4
*University of Texas v. Camenisch,*
  451 U.S. 390 (1981) ............................................................................... 2
*Wilderness Soc'y v. Tyrrel,*
  701 F.Supp. 1473 (E.D. Cal. 1988) ..................................................... 22
*Winter v. NRDC,*
  555 U.S. 7 (2008) ................................................................................... 3


**Statutes**
43 U.S.C. § 1712 ...................................................................................... 4
43 U.S.C. § 1732(a) ................................................................................. 4


**Other Authorities**
11A C. Wright, A. Miller, & M. Kane, Federal Practice Procedure § 2948.1, p. 139 (2d ed. 1995)
  ............................................................................................................. 18
69 Fed. Reg. 18770 (April 8, 2004) ........................................................ 5
American Heritage Dictionary, 1810 (3d ed. 1992) ............................... 17

**Rules**

Fed. R. App. P. 8 ................................................................................................................ 2

Fed. R. Civ. P. 62(c) ......................................................................................................... 2

**Regulations**

40 C.F.R. § 1502.14(a) ...................................................................................................... 16

43 C.F.R. § 1610.5-3(a) ...................................................................................................... 4

## INTRODUCTION

Plaintiffs submit this Memorandum in Support of their Motion for a Stay Pending Appeal.  Counsel for Plaintiffs has been informed by counsel for Defendant-Intervenor Murhpy Company that it intends to engage in winter logging when the project area receives sufficient snow.  Plaintiffs have filed a notice of appeal to the Ninth Circuit Court of Appeals (Dkt # 42), and in the likely event that sufficient snow accumulates to allow for winter logging, Plaintiffs intend to file a 27-3 Emergency Motion for Injunctive Relief with the Ninth Circuit Court of Appeals in the absence of a stay issuing from the District Court.  Due to Plaintiffs' obligations under FRAP 8(a)(1), and the fact that irreparable harm to Plaintiffs has already occurred and will re-occur if winter logging moves forward, Plaintiffs respectfully request that this Court issue a ruling as soon as practicable.

In the Order dated October 9, 2012, this Court denied Plaintiffs' Motion for Preliminary Injunction, concluding that the Bureau of Land Management (BLM) considered a reasonable range of alternatives, adequately considered cumulative effects, adequately considered impacts from logging mistletoe-infected old-growth, and adequately considered opposing scientific studies under the National Environmental Policy Act.   This Court also concluded that the Cottonwood Project would not contribute to the need to list the Pacific fisher and would contribute to the Pacific fisher's recovery pursuant to BLM's obligations under its Resource Management Plan (RMP) and Federal Land Policy and Management Act (FLPMA).  The result of this ruling is that irreparable harm caused by the Cottonwood timber sale (including logging of old-growth trees), fuels reduction, and road construction and re-construction proceeded without restraint until logging stopped due to wet weather conditions in the project area.

Plaintiffs bring this motion for a stay pending appeal to prevent irreparable injury to

Plaintiffs' interest in viewing, experiencing, and utilizing the Project area in an undisturbed state; prevent irreparable harm to the Pacific fisher and its habitat, as well as the multitude of species dependent on trees with mistletoe; and to prevent irreparable harm to old-growth trees.

## STANDARD OF REVIEW

Generally, "[o]nce a notice of appeal is filed, the district court is divested of jurisdiction over the matters being appealed." *Natural Resources Defense Council v. Southwest Marine, Inc.,* 242 F.3d 1163, 1166 (9th Cir. 2001) citing *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982) (per curium). This principle is not absolute, however, and the district court retains jurisdiction to act to preserve the status quo. *Id.,* citing *Masalosalo v. Stonewall Ins. Co.,* 718 F.2d 955, 956 (9th Cir. 1983); *Newton v. Consolidated Gas Co.,* 258 U.S. 165, 177 (1922); *see also* Fed. R. Civ. P. 62(c); Fed. R. App. P. 8. Rule 62(c) specifically allows a district court to "suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party." This rule does not grant the district court jurisdiction to re-adjudicate the merits of the case, but it does allow the district court to preserve the status quo during the pendency of the appeal. *Natural Res. Def. Council v. Southwest Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001). Through this motion, Plaintiff seeks to preserve the status quo pending appeal.

The standard for issuance of an injunction pending appeal is the same as that for issuance of a preliminary injunction. *Northwest Coalition for Alternatives to Pesticides v. Lyng*, 673 F. Supp. 1019 (D. Or. 1987) (employing analysis of *Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983)). The purpose of an injunction is to preserve the relative positions of the parties pending a trial on the merits. *University of Texas v. Camenisch*, 451 U.S. 390 (1981). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely

to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7 (2008).

The Ninth Circuit has adopted a "sliding scale" for the purposes of preliminary relief, in which

"[t]he degree of irreparable harm required for a preliminary injunction increases as the

probability of success on the merits decreases, and vice versa." *Earth Island Institute v. U.S.

Forest Service*, 351 F.3d 1291, 1300 (9th Cir. 2003).

      In environmental lawsuits, preliminary injunctive relief is appropriate "if the plaintiff's

moving papers raise 'serious questions' on the merits." *Los Angeles Memorial Col. v. Nat'l

Football League*, 634 F.2d 1197, 1203, n. 9 (9th Cir. 1980). *See also Fund for Animals v. Lujan*,

962 F.2d 1391, 1400 (9th Cir. 1992).  In *Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045,

1050 (9th Cir. 2010), the Ninth Circuit recently determined that this sliding scale test remains

intact:

> the 'serious questions' approach survives *Winter* when applied as part of the four-element
> *Winter* test.  In other words, 'serious questions going to the merits' and a hardship balance
> that tips sharply toward the plaintiff can support issuance of an injunction, assuming the
> other two elements of the *Winter* test are also met.

*Id.*  "The majority opinion in *Winter* did not . . . explicitly discuss the continuing validity of the

'sliding scale' approach to preliminary injunctions employed by this circuit and others. Under this

approach, the elements of the preliminary injunction test are balanced, so that a stronger showing

of one element may offset a weaker showing of another.  For example, a stronger showing of

irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits."

*Id.*

      "Serious questions" are those that are "substantial, difficult and doubtful enough" to

require more thorough investigation.  *Republic of the Philippines v. Marcos*, 862 F.2d 1355,

1362 (9th Cir. 1988).  These questions need not show a certainty of success, nor even

demonstrate a probability of success, but rather "must involve a 'fair chance of success on the merits.'" *Id.* (quoting *Nat. Wildlife Federation v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

District courts in the Ninth Circuit must apply the balance of harms analysis in environmental cases. *Lands Council v. McNair*, 537 F.3d 987, 1004 (9th Cir 2008) ("Our law does not…allow us to abandon a balance of harms analysis just because a potential environmental injury is at issue"). However, the Supreme Court has recognized that "[i]f environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). This is because "'environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.'" *Alliance for Wild Rockies*, 622 F.3d at 1053 (quoting *McNair*, 537 F.3d at 1004).

In addition, the four factors which comprise the test for whether preliminary injunctive relief should be granted must be evaluated in the context of the specific injunctive relief requested by Plaintiffs. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022-23 (9th Cir. 2009) (finding that "[w]hen deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction") (citations omitted).

## ARGUMENT

**I.    Plaintiff Raises Serious Questions and is Likely to Succeed on the Merits of its Appeal.**

    **A.    Plaintiffs raise serious questions and is likely to succeed on its claim under the Federal Lands Policy and Management Act**

FLPMA requires the BLM to prepare RMPs for the various districts under its control. *See* 43 U.S.C. § 1712. FLPMA and its implementing regulations require BLM to manage lands in compliance with the requirements of the RMP. 43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions . . . shall conform to

the approved plan.").

The Medford RMP requires that BLM "[m]anage for the conservation of Federal candidate and Bureau-sensitive species and their habitats so as not to contribute to the need to list and to contribute to the recovery of the species." AR-22770. The RMP also requires that the BLM "[m]odify, relocate, or abandon proposed actions that contribute to the need to list Federal candidate species … or their habitats." AR-22771. The Pacific fisher is a candidate species for listing as "endangered" under the ESA due to substantial declines and continued uncertainty about viability of the West Coast distinct population segment. *See* AR-5535 (69 Fed. Reg. 18770 (April 8, 2004)) (finding that Pacific fisher warrants protection as an endangered species). BLM has "detected fishers within the analysis area in the vicinity of Hyatt Reservoir." AR-2290.

Here, BLM violated these requirements with respect to the Pacific fisher because the Cottonwood timber sale will contribute to the need to list the fisher, and the Cottonwood timber sale will not contribute to the recovery of the Pacific fisher. The Ninth Circuit has instructed courts to use the plain meaning of undefined terms. *Lands Council v. Martin,* 479 F.3d 636, 642 (9th Cir. 2007) (applying plain meaning of undefined term in forest plan). The plain meaning of "contribute" is "[t]o make a contribution" or "[t]o help bring about a result; act as a factor." *American Heritage Dictionary*, 410 (3d ed. 1992). Therefore, as long as the Cottonwood timber sale would help bring about or act as a factor in the need to list the fisher, then the BLM violated the RMP.

> ### 1.    The Cottonwood timber sale threatens the destruction, modification, or curtailment of the fisher's habitat and range

The Cottonwood timber sale will contribute to the need to list the species because it threatens the destruction, modification, or curtailment of the fisher's habitat or range through timber harvest, fuels reduction, and road construction. 16 U.S.C. § 1533(a)(1)(A) (factor used to

determine whether to list a species under the ESA).

### i.      Timber harvest and fuels reduction

The EA concedes that "[m]ajor threats that remove key elements of fisher habitat include various forest management practices such as timber harvest and fuels reduction treatments." AR-2290.  It is undisputed that the Cottonwood timber sale contains both of these "major threats."  *See* AR-2201 ("Commercial timber harvest") AR-2211 ("fuels reduction treatment"); AR-2212 ("Unit specific information, including fuels reduction treatments are displayed in Table 2-2 and Maps 2-1, 2-2, 2-3 and 2-4"; Map 2-2 showing "activity fuel" treatment in all 39 units; Table 2-1 "summarizes . . . timber harvest methods"); AR-2268 (under cumulative effects heading, "[a]ctivities on BLM lands will likely continue to focus on commercial thinning for forest health and fuels reduction projects").  Here, the BLM will engage in the same "major threats" that have led to the fisher's current status as a candidate species, yet BLM concludes that this will not contribute to the need to list the fisher.  *See Motor Vehicle Mfrs. Assoc. v. State Farm Ins. Co.,* 463 U.S. 29, 43 (1983) (action is arbitrary and capricious if agency "offered an explanation for its decision that runs counter to the evidence before the agency").

### a.      Timber harvest and fuels reduction will reduce fisher prey

It is undisputed that timber harvest and fuels reduction will adversely affect the fisher's prey, which is one of two "critical features that explain fisher habitat use,…." AR-9141.  Here, the EA attempts to downplay this impact by stating, without support, that it will be resolved in the future:  "Thinning treatments would have short term adverse effects to habitat for some fisher prey species due to the reduced vegetation.  These effects are relatively short term, as understory vegetation typically returns within 5 years." AR-2297.  Importantly, Defendants cite to nothing in FLPMA that permits a short-term violation of the RMP, as long as it is allegedly cured

sometime in the future.  The National Forest Management Act (NFMA) does not contain a *de minimis* exception, see *Goodman*, 505 F.3d at 895 (finding that the Forest Service violated forest plan standard for Riparian Reserve designation and that NFMA "contains no *de minimis* exceptions"), and, absent a specific statement to the contrary, there is no reason to expect that FLPA would provide for a *de minimis* exception.  *See Kern v. BLM*, 284 F.3d 1062, 1070 (9th Cir. 2002) ("FLPMA is the equivalent, in this case, to NFMA in *Ohio Forestry*").  It is, therefore, undisputed that for the next five years, the fisher will be adversely affected from reduced prey as a result of the Cottonwood timber sale.

> **b.    Timber harvest and fuels reduction will reduce canopy closure**

The Cottonwood timber sale proposes to reduce 431 acres of Northern Spotted Owl (NSO) Nesting Roosting Foraging (NRF) habitat to 60% canopy cover and reduce 294 acres of NSO dispersal habitat to 40% canopy closure.  AR-929.  Despite clearly acknowledging that canopy closure would be reduced in every logging unit, the BLM states that "fuels reduction treatments as proposed in Chapter 2 do not typically alter the overstory forest structure or remove key habitat components related to fisher habitat."

First, the Cottonwood timber sale's proposed reduction in canopy is at odds with studies in the record for the fisher as it relates to canopy closure.  For example, the USFWS' 12-month finding for the fisher states that "[i]n the Klamath and north coast regions of California, Carrol *et al*. (1999) also found a strong association [of fisher] with high levels of tree canopy cover, tree size class, and percent conifer."  AR-9141; AR-9141-9142 ("greater than 50 percent canopy cover" and "greater than 60 percent canopy cover").  All canopy closure recognized by USFWS in their 12-month finding for the fisher were greater than 50 percent canopy closure, but the Cottonwood timber sale reduces the majority of the project area (i.e. 59.4% of the project area)

to 40% canopy closure.

        **ii.**       **Road construction and reconstruction**

     The EA also concedes that "[a]bout 2.1 miles of new road would be constructed. Some of this road construction will remove existing forest and contribute to the fragmentation of habitat used by the fisher." AR-2298.[1] It is undisputed that fragmentation of the fisher's habitat contributes to the decline of the species: "Habitat fragmentation has contributed to the decline of fisher populations because they have limited dispersal distances and are reluctant to cross open areas to recolonize historical habitat." AR-9146. The Jenny Creek Watershed has very high road densities that contribute significantly to areas that fishers are reluctant to cross. See AR-13162 ("[h]igh road density in Jenny Creek Springs, Grizzly Creek and Soda Creek drainage areas."); AR-13163 (for the Johnson and Sheepy Creek Subwatershed, "[t]here are high road densities over much of the area"); id. (in the middle Jenny Creek subwatersheds, "[t]here are high road densities except in the Parker/Jenny drainage area"); AR-13164 (in the Keene Creek Subwatershed, where the Project area is located, "[r]oad density is high in the middle part of the subwatershed particularly in the Lincoln Creek drainage area").

     The Cottonwood timber sale also includes reconstruction of roads, some of which "have become overgrown due to years of non-use[.]" AR-4599. In fact, of the 36 miles of roads that would be used for hauling, 9.93 miles of those roads include natural existing surface roads, see AR-2214-2215, and reconstruction of these roads would only further fragment the fisher's habitat. Adding to the impacts, "[a]reas of new road construction and re-opened roads are particularly vulnerable to increased OHV [Off-Highway Vehicle] use." AR-2343. Road construction and reconstruction combined with existing high road densities and increased

---

[1] The 2.1 miles of road construction included in the Revised EA was modified in the DR to include 1.75 miles of road, which includes 1.15 miles of permanent road construction and 0.6 miles of temporary road construction.

vulnerabilities to OHV use will further fragment a predominantly splintered watershed, thus modifying and curtailing the fisher's habitat and range.

### iii. The Cottonwood timber sale fails to contribute to the recovery of the Pacific fisher

The RMP standard at issue also requires that the Cottonwood Project contribute to the recovery of the fisher. <u>See</u> AR-22770. The above impacts from the Cottonwood timber sale and cumulative impacts from surrounding timber sales not only contribute to the need to list the fisher, but they also do not contribute to the recovery of the fisher. Therefore, the BLM has violated the RMP standard, and, as a result, the BLM has violated FLPMA.

### B. Plaintiffs raise serious questions and are likely to succeed on their claim that the BLM failed to take a hard look at logging old-growth infected mistletoe.

The BLM failed to take a hard look at the impacts of logging trees with mistletoe because it admittedly did not disclose the number, location, or site-specific impacts of logging mistletoe trees. The BLM has not even provided an estimate of the number of mistletoe-infected trees that it will remove, and, therefore, it is impossible to ascertain the impact associated with removing an unknown number of mistletoe-infected trees. NEPA's procedural requirements require agencies to take a hard look at the environmental consequences of their actions. A hard look includes "considering all foreseeable direct and indirect impacts." *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). A hard look requires the BLM to "undertake a thorough environmental analysis before concluding that no significant impact exists." *Id*. at 1239. Here, the BLM's omission is significant in light of the critical role of mistletoe-infected trees in contributing to biodiversity and stand structure throughout forests. For example, mistletoe-infected trees are important for NSO habitat and prey, fisher habitat and prey, bureau-sensitive species, survey and manage species, and the recruitment of future snags and coarse

woody material.  AR-2323, 2291, 2301-02, 6394, 13109, 2295, 2289.  While the BLM is upfront

about the benefits of mistletoe-infected trees, it fails to disclose even an estimate of the number

of mistletoe-infected trees to be removed, which masks the impacts to the aforementioned forest

resources.  In essence, the BLM brushes aside the adverse impacts of logging trees with

mistletoe.

        Despite the potential negative connotation of a tree being infected with mistletoe, these

trees provide a significant benefit to biodiversity and stand structure:

> The benefits of dwarf mistletoe as wildlife habitat and a food source are well known
> (Mathiasen, 1996).  Not only does the presence of mistletoe contribute to stand diversity
> through the creation of gaps, structural irregularity and contribute to the accumulation of
> snags and down wood, it also serves as habitat for a variety of mammals, birds and
> arthropods.  In particular in the Siskiyou Mountains, large witch's brooms serve as nest
> platforms for spotted owls and raptors.  There is evidence that groups of mistletoe
> infected trees are the most likely areas for spotted owls to nest in the white fir and
> Douglas-fir forests of the Siskiyou Mountains (Marshall, 2003; Mallams & Goheen,
> 2005).

AR-2323; AR-2291 (for the Great Gray Owl, a survey and manage species under the Northwest

Forest Plan, "mistletoe clumps … provide suitable nest structures); AR-2301-2302 (Johnson's

Hairstreak, a BLM sensitive species, spends the majority of its lifecycle high in the canopy of

older conifers with mistletoe infection"); AR-6394 ("Within each locality, the species of live

trees and snags that are most likely to develop rust brooms, mistletoe brooms, platforms, or

cavities appear to be more important to fishers than those that do not …."); AR-13109 ("Forest

pathogens probably contribute more to diversity in forest structure and the landscape pattern of

the watershed than fire.");  AR-2295 ("Lemkuhl et al. (2006) found that fuels projects in eastern

Washington could have impacts on bushy-tailed woodrats [i.e. NSO prey], but confirmed the

importance of maintaining snags, down wood, and mistletoe").  In fact, the BLM concedes that

"the best quality [Nesting, Roosting, Foraging] habitat [for northern spotted owls] has forest

stands with … mistletoe platforms" among other characteristics." AR-2289. Logging unknown

numbers of the best quality habitat of a listed species requires, at the very least, an estimate of

the number of trees that will be logged.

An important component of these species' habitat, including NRF habitat, will be logged,

yet a purpose and need of the project, ironically, is to "[m]aintain stand structure for nesting,

roosting, foraging, and dispersal habitat components within spotted owl habitat." AR-2203; id.

("There is a need to maintain existing nesting, foraging, and dispersal habitat conditions, in the

Cottonwood Project Area to contribute to the conservation and recovery of Federally listed

species and their habitats in compliance of BLM's resource management plan and the

Endangered Species Act"). Thus, while the Cottonwood timber sale aims to maintain NRF

habitat through maintenance of canopy cover, it removes "the best quality NRF habitat" by

removing mistletoe-infected trees. Under NEPA, the BLM is free to remove these trees, but it

must take a hard look, which "involve[s] a discussion of adverse impacts that does not

improperly minimize negative side effects." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d

1147, 1159 (9th Cir. 2006) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d

1233, 1241 (9th Cir. 2005).

The BLM states that "[m]istletoe is common throughout this project area, watershed and

surrounding watersheds," AR-2374, but this contention is belied by the BLM's similar

contention that the analysis area (which is geographically larger than the project area) contains

only a limited amount of mistletoe:

> *Western dwarf mistletoe (Arceuthobium campylodpodum) and Douglas-fir mistletoe (Arceuthobium douglasii) infections are localized mainly in the southern portions of the analysis area, where elevations are lower.* Infections are usually systemic and form bunched globose growths of branches called "witches brooms". These brooms, occurring mostly in the lower third of the tree canopy, are produced by local physiological changes induced by the parasite to get the tree to transport food to the mistletoe.

AR-2309.  The BLM then argues that "[w]ith or without management activities, dwarf mistletoe

will continue to be a stand and landscape feature on lands managed by the BLM.  About 60-70

percent (approximately 550,00 to 600,000 acres) of the BLM-administered lands on the Medford

District are not allocated to timber management."[2]  AR-2323.  The purpose of the project,

however, is to maintain NFR habitat in the *project area*, not the landscape level.  *See* AR-2203

("There is a need to maintain existing nesting, foraging, and dispersal habitat conditions, in the

*Cottonwood Project Area*….") (emphasis added).  In addition, the BLM's attempt to minimize

the impacts of removing "the best quality NRF habitat" by averaging it out over the entire

landscape runs afoul of the Ninth Circuit's precedent in *Oregon Natural Res. Council Fund v.

Brong*, 492 F.3d 1120, 1130 (9th Cir. 2007).  There, the Ninth Circuit held that the BLM's

"attempt to dilute the effects of its proposed activities by averaging … over such a wide area"

was unlawful.[3]

Furthermore, the BLM's plan for removing mistletoe-infected trees would remove trees

with visible signs of infection, as well as those trees *that do not have any outward sign of

infection*.  For example, the BLM states that:

> In stands where Douglas-fir dwarf mistletoe (*Arceuthobium douglasii*) is present,
> silvicultural treatments are designed to slow the spread of the infection, rather than
> eradicate the parasite.  These stand level treatments aim to strategically retain trees that
> have the least likelihood of contracting the disease and *remove the trees that might have
> "latent infections," due to their proximity of trees with visual symptoms*.

AR-2392.  Thus, removal of mistletoe-infected trees is not limited to those that are infected, but

---

[2] Mistletoe does not occur uniformly across the landscape as suggested by the BLM.  The EA
clearly notes that "infections are localized mainly in the southern portions of the analysis area,
where elevations are lower."  To suggest that it exists throughout the landscape is misleading
because it typically occurs only in lower elevations.

[3] As Justice Brandeis stated:  "I abhor averages ….  A man may have six meals one day and none
the next, making an average of three meals per day, but that is not a good way to live."  The
Words of Justice Brandeis 32 (Solomon Goldman ed., 1953).

also those that may have a "latent infection."  Practically speaking, any tree "might have 'latent infections,'" which can lead to arbitrary results (i.e., removal of healthy trees).

Instead of providing the public and the decision-maker with *any* data on the amount or location of mistletoe-infected trees that will be removed, the BLM repeatedly assures the public that it will remove only a minimal amount of trees:

> Silvicultural prescriptions are designed to address the desired conditions at the stand level.  Collecting data or information on the presence of every tree in a stand that has a sign or symptom of mistletoe disease would not be a practical [*sic*] nor would it lead to a better decision concerning the management of the mistletoe within stands.  Information regarding the amount and location of mistletoe trees that will be marked for "cut" does not become available until after the analysis is completed and the stands are marked and cruised.

AR-2392.  First, if the BLM is authorizing the removal a minimal amount of infected trees (e.g., 25 or 50), then it would not be burdensome to identify these trees before logging or provide the public with that estimate.  However, if the BLM is removing thousands of mistletoe-infected trees in the project area, then it would be more difficult to identify trees for removal, but this would also mean that more than a minimal amount of trees would be removed, contradicting the BLM's assertion.  In essence, the BLM's refusal to even provide an estimate indicates that a significant number of mistletoe-infected trees will be removed.  The public and the decision-maker, however, have been shut out of a meaningful NEPA process.

Importantly, the BLM's concession that "[i]nformation regarding the amount and location of mistletoe trees that will be marked for 'cut' does not become available until after the analysis is completed and the stands are marked and cruised" fundamentally misunderstands the role of NEPA.  AR-2392.  Information about environmental impacts must be assessed first, so that the decision-maker can make an informed decision and the public can comment.  Here, the BLM has subverted the fundamental role of NEPA to inform the public and the decisionmaker

about the environmental impacts of its decision, and failed to take a hard look at environmental impacts.

This is not just a case of deferring analysis of environmental impacts, though even that would be unlawful under the Ninth Circuit's case law. *See Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("Nor is it appropriate to defer consideration of cumulative impacts to a future date"). Rather, this is a case of entirely failing to set forth any impacts of mistletoe logging because, as the BLM concedes, it has not collected *any* information on the issue. The purpose of NEPA is "to obviate the need for speculation by insuring that available data are gathered and analyzed *prior* to the implementation of the proposed action." *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 732 (9th Cir. 2001) (emphasis added). The Court in *Nat'l Parks* went on to observe that it is impermissible for the agency to "increase the risk of harm to the environment and then perform its studies…. This approach has the process exactly backwards." *Id.* at 733. Because mistletoe-infected trees benefit biodiversity, forest structure, and provide "the best quality NRF habitat," the NEPA analysis must be conducted "before a decision that may have significant adverse impact on the environment is made." *Id.*; *see also* 40 C.F.R. §§1500.1(b), 1502.5, 1506.1. Not only has the BLM failed to address the environmental impacts of its decision, but it does not even purport to *disclose* the impacts of logging trees with mistletoe once it determines where and how many trees with mistletoe have been logged. Therefore, the public and the decision-maker have been entirely shut out of the NEPA process, and environmental impacts remain undisclosed in violation NEPA.

The BLM maintains that "[g]iven that mistletoe removal will occur only occasionally throughout this project, the overall effects of such removal are anticipated to be small." AR-

2294.  Here, the BLM's logic is conclusory because it assumes removal will be minimal, but fails to *demonstrate* that removal will be minimal.  The problem is that the decision-maker and the public *must* accept the conclusion without any way of confirming it.  In other words, the BLM asks this Court to take its word for it that only a minimal number of mistletoe-infected trees will be removed.  Under the Ninth Circuit's precedent, courts do not simply take an agency's "word for it and not question their conclusory assertions."  *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1131 (9th Cir. 2011) ("the agencies would like this court to take their word for it and not question their conclusory assertions"; "their word, however, is not entitled to significant deference that courts give [agency methodology]").  The BLM simply cannot know that mistletoe logging will be "limited," "occur only occasionally," or insignificantly impact wildlife species, if it has not collected *any* information on the amount or location of the mistletoe-infected trees to be logged.  The issue here is that BLM refuses to disclose even an estimate of the number of mistletoe-infected trees to be removed, which are critical to a multitude of environmental factors.

Finally, the BLM takes the novel position that because it would not "eradicate" mistletoe-infected trees, it need not disclose the environmental impacts.  *See* AR-2301 ("As mistletoe would not be eradicated from the project area, this butterfly would likely continue to persist."); AR-2323 ("The proposed forest management project does not attempt to eradicate dwarf mistletoe from the landscape; rather it attempts to minimize it in specific areas ….").  The BLM, however, points to no authority indicating that "eradication" of some environmental component is the test for when environmental impacts must be analyzed.  It would no doubt be arbitrary for the BLM to argue that because it is not eradicating old-growth trees or NSOs, it need not analyze the effects of removing those critical forest components.  Thus, the agency's refusal to take a

hard look at the impacts of logging unknown numbers of mistletoe-infected trees is arbitrary and capricious.

**C.    Plaintiff raises serious questions and is likely to succeed on their claim that the BLM failed to consider a reasonable range of alternatives**

The BLM is required to "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The alternatives section is the "heart" of the NEPA document. *Id.* § 1502.14; *see also Kootenai Tribe of Idaho v. Veneman,* 313 F.3d 1094, 1120 (9th Cir. 2002) (agency must "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public."). "'NEPA requires that alternatives … be given full and meaningful consideration,' whether the agency prepares an EA or an EIS." Ctr. *for Biological Diversity v. Nat'l Hwy Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) (quoting *Native Ecosystems Council*, 428 F.3d at 1245). The "touchstone" for the Court's inquiry is whether the "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Californai v. Block,* 690 F.2d 753, 767 (9th Cir. 1982).

Reasonable alternatives are those that are viable, feasible, meet the stated goals of the project, or are reasonably related to the purposes of the project. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992). "The existence of a viable but unexamined alternative renders an [EIS] inadequate." *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985). Here, the agency failed to consider a reasonable range of alternatives because it failed to consider an alternative that avoids constructing roads in the Jenny Creek Watershed, given the high density of roads throughout the Jenny Creek Watershed.

The BLM refused to analyze an alternative that did not entail road construction because it allegedly would have required helicopter harvesting, and "[r]equiring helicopter yarding of these units would have resulted in dropping units from proposed harvesting and would not have been

consistent with the RMP direction for managing units for sustained timber production."  AR-2247.  The BLM's justification is arbitrary because the Cottonwood timber sale Decision Record (DR) modified the timber sale to drop units, and when this occurred, the BLM was not violating its own policy to manage for sustained timber production.  For example, the BLM dropped 10 units between the Revised EA and the DR, including one unit that required 0.3 miles of road construction.  *Compare* AR-2212-2213 (EA) *with* AR-929 (DR).  Plaintiffs' proposal to drop three units that contained road construction no more violates the RMP standard than the BLM did when it dropped 10 units, one of which required road construction.

Here, the BLM misunderstands the plain meaning of the word "sustainable."  The definition of "sustain" is to "keep in existence; maintain."  *American Heritage Dictionary*, 1810 (3d ed. 1992); id. (defining "sustained yield" as "[t]he continuing yield of a biological resource, such as timber from a forest, by controlled periodic harvesting").  Thus, "sustainable timber production" does not require that all possible units be logged now; instead, it means that the BLM must "keep in existence" or "maintain" enough units to provide for other logging opportunities in the future.  Finally, the BLM points to nothing in the record to demonstrate that avoiding road construction in a degraded Key Watershed inhibits sustainable timber production.  See AR-2283.  Without some support for its rationale, the agency simply relies on conclusions.

**III.    Plaintiffs have suffered and will suffer irreparable harm absent a stay**

Plaintiffs clearly demonstrated, consistent with Ninth Circuit precedent, that they will suffer irreparable harm.  The Ninth Circuit has determined that logging old-growth trees is an irreparable injury:  "the resulting injury – logging of old-growth trees – is a permanent environmental injury."  *Lands Council v. Martin*, 479 F.3d 636, 643 (9th Cir. 2007).  Furthermore, in *Alliance for the Wild Rockies*, the plaintiffs argued that it suffered irreparable

harm because the Project will harm its "members' ability to 'view, experience, and utilize' the areas in an undisturbed state."  632 F.3d at 1135.  There, the Ninth Circuit concluded that "actual and irreparable injury, such as [the plaintiff] articulates here, satisfies the 'likelihood of irreparable injury' requirement articulated in *Winter*."  *Id*.

Irreparable injury to Plaintiffs has already occurred and will continue if winter logging goes forward.  First, logging has caused harm to the interests of Plaintiffs in the form of logging old-growth trees, and by precluding Plaintiffs' ability to view, experience, and utilize the planning area and harvest units in their undisturbed states.  *See* Declaration of Geroge Sexton, ¶¶ 9-16.  The logging has interrupted the natural processes, created significant ruts in soils, damaged meadows in wet weather conditions, and it is simply not possible to "put the trees back on the stump" now that they have been logged.  *See* Declaration of George Sexton, ¶¶ 9-16.  There is no substitute for the areas that have been logged or that will be logged.  Importantly, this Court has held that to prevail on a claim that a project is legally inadequate, "a plaintiff need not show that significant effects will in fact occur.  It is enough for the plaintiff to raise substantial questions whether a project *may* have a significant effect on the environment."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).  Furthermore, Plaintiffs will also be harmed by the BLM's failure to follow the procedures required by law, including the requirement to take a hard look at environmental impacts.   As opposed to the mere "possibility of some remote future injury" that the Supreme Court rejected in *Winter*, these are present and concrete harms that Plaintiffs hav experienced and will continue to experience.  *Winter*, 129 S. Ct. at 375 (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice Procedure § 2948.1, p. 139 (2d ed. 1995).

In addition to the irreparable harm that occurred as a result of the limited logging,

Plaintiffs identified clear irreparable harm that would occur as a result of implementing the Cottonwood timber sale during the preliminary injunction briefing. *See* Dkt # 17, ¶ 2 (in units 20-1 and 20-2, "I witnessed a wet meadow at the headwaters of the Jenny Creek where the BLM proposes to construct a new road and what I consider to be a spectacular old-growth forest dominated by very large Douglas-fir and pine trees."); Dkt # 17, ¶ 4 ("the Cottonwood Timber Sale area is unusual among mixed conifer forests in southwest Oregon because it contains a high concentration of remnant old-growth habitat"); Dkt # 17 (photos of units 20-1 and 20-2 where road construction and logging will occur); Dkt # 18, ¶ 18 ("We will be directly harmed if this area of high biodiversity and intersection of different provinces is subjected to logging, yarding, hauling, and road construction activities as authorized in the Cottonwood timber sale."); Dkt # 37, ¶ 7 ("based on my own personal on-site experience in recent years (including 2012) at least unit 20-2 of BLM's proposed Cottonwood timber sale contains many acres of unequivocally rare, roadless, and preciously unique-in-our-place/time, irreplaceable old-growth forest").

The BLM has previously proposed a portion of the area to be logged as an Area of Critical Environmental Concern, with irreplaceable values and old-growth. *See* Dkt # 21, ¶ 3 ("[a] portion of the area of the Cottonwood timber sale that will be fragmented by road construction and subject to logging (including old-growth logging) was previously nominated as an Area of Critical Environmental Concern, referred to as the Little Hyatt Groves and the Little Hyatt Recreation Area"); Dkt # 21, ¶ 4 ("The BLM observed the irreplaceable value of this particular area, calling it "[v]ulnerable to adverse change," "irreplaceable, unique," "[u]nentered," "[e]xtremely high recreation use"; and it "exhibited 'extreme wildlife importance'"); Dkt 21, ¶ 4 (BLM's review of the potential Area of Critical Environmental Concern noted that "[t]he old growth groves along the PCT [Pacific Crest Trail] add to the

character of the trail" and that "any old growth groves within the Hyatt/Howard SRMA should

be potential ACECs since they had to the significant scenic value of the area (Relevance) and old

growth is more than locally significant (importance)").  In light of clear irreparable harm, other

District courts have stayed implementation of timber sales pending appeal despite denying a

Plaintiffs' motion for relief.  *See* Declaration of Sean Malone in Support of Plaintiff's Stay

Pending Appeal, Exhibit A at 4 (despite ruling against plaintiffs on summary judgment, Judge

Lonnie R. Suko stayed implementation of timber sales because of "the risk that old growth forest

could be lost without compliance with applicable law").  Judge Suko's order staying logging

pending the appeal was prudent because the Ninth Circuit overturned his summary judgment

decision on appeal.  *See Lands Council v. Martin*, 529 F.3d 1219 (9th Cir. 2008).  Without Judge

Suko's stay pending appeal, logging would have continued in violation of federal environmental

law.

IV.    **The Balance of Equities Tips Sharply in Favor of Plaintiffs and a Stay Pending
       Appeal is in the Public Interest**

In evaluating whether to grant an injunction in environmental cases, courts must apply

the balance of harms analysis.  *Lands Council*, 537 F.3d at 1004 ("In balancing the harms, we

must weigh the environmental harms invoked by [the plaintiffs] against the other injuries

identified by the [Defendants and Intervenors]").  The Ninth Circuit recognizes that:

> Environmental injury, by its nature, can seldom be adequately remedied by money
> damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such
> injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance
> of an injunction to protect the environment.

*Gambell*, 480 U.S. at 545.  Regardless, as noted in *Lands Council*, "[o]ur law does not, however,

allow us to abandon a balance of harms analysis just because a potential environmental injury is

at issue."  537 F.3d at 1005.  In *Lands Council*, this Court balanced the "potential environmental

injury" to plaintiffs against the fact that "enjoining the project will force the timber companies

20 – Memorandum in Support of Plaintiffs'
Motion for Stay Pending Appeal

that purchased the sales to lay off some or all of their twenty-seven workers, in addition to other

indirect harm to the struggling local economy." *Id*.

Here, on the other hand, Plaintiffs have demonstrated clear environmental injury, not

simply the potential for irreparable harm, and the timber company at issue here has not indicated

that it would lay off a single worker if the project was enjoined. *See* Dkt # 31.  In fact, the

Cottonwood timber sale is providing "extra income" for Intervenor-Appellee Murphy Company.

For example, the Declaration of John R. Murphy states:  "Throughout 2012, markets have

improved and our work force is employed full time and earning extra income working overtime

to meet the demand from our improved order file."  Dkt # 31, ¶ 3.  Mr. Murphy does not allege

that employees would be laid off if an injunction is granted or that the company itself would

experience <u>any</u> substantial setback if an injunction is granted.  To the contrary, it appears as

Murphy Company has an excess of work beyond the extra work provided from the Cottonwood

timber sale.  For example, Murphy Company is currently benefitting from the Misfit timber sale:

> The Misfit Timber Sale provides Murphy Company with immediate access to 20,963
> commercial sized conifer trees on public lands comprising 7,759 CCF of Net Saw
> Volume. In contrast, only 5,624 CCF is at issue in the Cottonwood BLM old-growth
> timber sale that requires new logging road construction in the Jenny Creek Key
> Watershed.

Dkt # 34, ¶ 7.  The Klamath-Siskiyou Wildlands Center (a Plaintiff-Appellant in the present

case) "worked to endorse and streamline release of the Misfit timber sale in order to help achieve

the small-diameter thinning objectives of the Misfit Forest Service project."  Dkt # 34, ¶ 5.  The

"Misfit Timber Sale was not appealed or objected to by any conservation organization due to the

ability of the Forest Service to plan timber sales that do not punch additional logging roads into

Northwest Forest Plan Key Watersheds while retaining large-diameter old-growth trees where

they still exist."  Dkt # 34, ¶ 6.  Given the existing work and lack of economic impacts from an

injunction, the balance of harms favors an injunction.

The interest asserted by the BLM is simply achieving the objectives of the sale. See Dkt. 42. However, simply carrying out the objectives of a timber sale does not outweigh Plaintiffs' irreparable harm. *Seattle Audubon Soc'y v. Evans*, 771 F.Supp. 1081, 1095 (W.D. Wash. 1991) ("while loss of old growth is permanent, the economic effects of an injunction are temporary and can be minimized in many ways"); *Los Angeles Mem. Coliseum v. National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (holding that "mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm"); *Wilderness Soc'y v. Tyrrel*, 701 F.Supp. 1473, 1491(E.D. Cal. 1988) (citing *Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988), *rev'd on other grounds*, 918 F.2d 813 (9th Cir. 1990) ("the Government's economic loss cannot be considered compelling if it is to be gained in contravention of federal law"). In addition, there has been no showing by BLM that a brief delay would create undue harm to the agency.

Reviewing courts must also ensure that an injunction is in the public interest. An injunction in the present case would not only stop the degradation caused by the logging, road construction, and road reconstruction, but it also would protect the public's interest in preventing the BLM from acting in a manner inconsistent with the applicable law. "Such compliance is especially appropriate in light of the strong public policy expressed in the nation's environmental laws." *Citizen's Alert Regarding Environment v. U.S. Dep't of Justice*, 1995 WL 748246, *11 (D.D.C. 1995). The public's interest in making sure that federal agencies manage public lands in compliance with environmental laws "invokes a public interest of the highest order: the interest

in having government officials act in accordance with the law." *Seattle Audubon Soc'y v. Evans*, 771 F.Supp. at 1096.

The overriding public interest of ensuring compliance with the applicable laws designed to prevent environmental harm outweighs any potential economic harm that could result from temporarily enjoining implementation of the Cottonwood timber sale. As demonstrated here, Murphy Company is benefitting from other timber sales streamlined by one of the Plaintiff organizations and that Murphy Company's "work force is employed full time and earning extra income working overtime . . . ." Dkt. # 31, ¶ 3.

## CONCLUSION

Because a limited amount of logging has already occurred, this Court can issue a stay pending appeal to preserve the status quo. Plaintiffs, therefore, respectfully request that this Court issue a stay pending appeal to avoid further irreparable injury to the environment and to Plaintiffs.


Respectfully submitted December 19, 2012.

<div style="margin-left:50%">

s/ Sean T. Malone
Sean T. Malone OSB # 084060
Attorney at Law
259 E. 5th Ave, Suite 200-G
Eugene, OR 97401
Tel. (303) 859-0403
Fax. (650) 471-7366
seanmalone8@hotmail.com

Marianne Dugan (OSB # 93256)
Attorney at Law
259 E. 5th Ave., Ste 200-D
Eugene, OR 97401
Tel. (541) 338-7072
Fax. (866) 650-5213
mdugan@mdugan.com

</div>

23 – Memorandum in Support of Plaintiffs'
Motion for Stay Pending Appeal

## **Certificate of Service**

I hereby certify that on December 19, 2012, Plaintiffs filed through the United States

District Court ECF System the foregoing to be served by CM/ECF electronic filing on the

following attorneys of record:

Michael E. Haglund
Haglund Kelley Jones & Wilder
200 SW Market St. Ste 1777
Portland OR 97201
Ph. 503.225.0777
Fax 503.225.1257
haglund@hk-law.com

Alison Garner
U.S. Department of Justice
Environment and Natural Resources Division
PO Box 7611
Washington DC 20044-7611
Ph. 202.514.2855
Fax. 202.305.0506

Jason Hill
U.S. Department of Justice
Environment and Natural Resources Division
PO Box 7611
Washington DC 20044-7611
Ph. 202.514.1024
Fax. 202.305.0506

/s/ Sean T. Malone
Sean T. Malone
*Attorney for Plaintiffs*

24 – Memorandum in Support of Plaintiffs'
Motion for Stay Pending Appeal