IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

SODA MOUNTAIN WILDERNESS COUNCIL;
OREGON WILD; KLAMATH SISKIYOU
WILDLANDS CENTER; CENTER FOR
BIOLOGICAL DIVERSITY; and CASCADIA
WILDLANDS PROJECT,

               Plaintiffs,

        v.

UNITED STATES BUREAU OF LAND
MANAGEMENT,

               Defendant,

      and

MURPHY COMPANY,

               Intervenor-Defendant.

Case No. 1:12-cv-001171-CL

**REPORT &
RECOMMENDATION**

_____

CLARKE, Magistrate Judge.

      In August 2011, defendant Bureau of Land Management ("BLM") approved the

Cottonwood Forest Management Project ("the Project"), a timber sale involving logging on 725

acres and 1.65 miles of road construction on BLM land in southern Oregon.  Plaintiffs,

environmental groups Soda Mountain Wilderness Council, Oregon Wild, Klamath Siskiyou

Wildlands Center, Center for Biological Diversity, and Cascadia Wildlands Project (collectively,

Page 1 – REPORT AND RECOMMENDATION

"plaintiffs"), bring this action under the Administrative Procedure Act ("APA") to challenge the BLM's decision. Murphy Company ("Murphy"), the purchaser of the Project, has intervened as a defendant (#9). Plaintiffs allege that the BLM's approval of the Project violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.* This court has jurisdiction pursuant to 28 U.S.C. § 1331. Presently before the court are plaintiffs' motion for summary judgment (#47), the BLM's cross-motion for summary judgment (#54) and motion to strike extra-record documents (#59), and Murphy's cross-motion for summary judgment (#56). For the reasons stated below, the court grants in part and denies in part the BLM's motion to strike, and recommends that plaintiffs' motion for summary judgment be denied, and BLM's cross-motion for summary judgment and Murphy's cross-motion for summary judgment be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Project Area

The Cottonwood Forest Management Project entails harvesting timber on 725 acres, constructing 1.15 miles of new roads, and decommissioning 1.9 miles of existing roads in the western portion of the Jenny Creek watershed near Ashland, Oregon. AR 928.[1], [2]  The Project would occur on 27 separate harvest "units" on the BLM-managed land in the Jenny Creek watershed. AR 929.

The analysis for the Project is the western portion of the Keene Creek sub-watershed, an area which forms the boundary between the Rogue and Klamath basins in the southern Cascade Range. Tr. 2259-60. The area is located in a "Tier 1 Key Watershed," a watershed particularly

---

[1] The administrative record ("AR") is a compilation of documents the BLM relied upon to make its decision and sets forth the material facts in this case.

[2] The Project originally involved thinning on 1,108 acres. AR 2213. The Decision Record reduced the amount of thinning to 725 acres. AR 928.

well-suited to provide habitat for the recovery of at-risk stocks of resident fish species. AR 2259. The Keene Creek sub-watershed is also home to portions of the Pacific Crest National Scenic Trail, special status plants, and a variety of animals, including owls, the Pacific fisher, mollusks, and eagles. AR 2353, 2289, 2291. Within recent years, greater forest stand density and a rise in bark beetle attacks and pathogens on forest stands have caused an increase in fire hazard within the Project area. AR 2306-2309.

The land managed by BLM in the Project area is designated by the Northwest Forest Plan ("NWFP") as "matrix" land.[3] AR 2203. Matrix land is land designated as "unreserved areas…in which timber harvest may go forward subject to environmental requirements." Seattle Audubon Soc'y v. Lyons, 871 F. Supp. 1291, 1305 (W.D. Wa. 1994), aff'd sub nom, Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401 (9th Cir. 1996). Portions of the Project area are additionally governed by provisions of the Oregon and California Act ("O&C Act"), which provide that the primary use of O&C lands is timber production, to be managed in conformity with sustained yield principles. Headwaters, Inc. v. BLM, 914 F.2d 1174, 1183 (9th Cir. 1990).

## II.    The Project

The BLM proposed the Project "to provide for long-term forest (timber) production in the Cottonwood Project Area consistent with timber management objectives of the 1995 Medford District Resource Management Plan." AR 2203. The Medford District Resource Management Plan ("RMP") provides objectives and guidelines for implementing forest management projects in the Medford BLM district. AR 22716-22975. Specifically, the BLM intended that the Project (1) ensure sustainable forest production by reducing the risk of stand loss from fires, insects and

---

[3] The NWFP is a series of federal policies drafted to protect northern spotted owl habitats over 24.5 million acres in the Pacific Northwest, while also providing recreational opportunities and sustainable timber supply. AR 24233-25912; see also Or. Natural Resources Council Fund v. Brong, 492 F.3d 1120, 1126 (9th Cir. 2007). The NWFP allocates land into six different categories according to their use. Land outside of the six categories is "matrix," and is to be used primarily for timber harvest. AR 24263.

Page 3 – REPORT AND RECOMMENDATION

disease; (2) provide forest products; (3) maintain stand structure for northern spotted owl ("NSO") habitat;[4] and (4) maintain a transportation system within the Project area.  AR 2203.

### III.    Procedural History

On October 29, 2010, the BLM issued a notice asking for preliminary "scoping" comments about the Project.  AR 2207.  The BLM subsequently issued an Environmental Assessment ("EA") for the Project and announced a 30-day public comment period.  AR 2458-2461.  In August 2011, the BLM issued a Finding of No Significant Impact ("FONSI"), concluding that an Environmental Impact Statement ("EIS") was not warranted.  AR 938-945.  The BLM then issued a Decision Record ("DR") for the project and a revised EA.  AR 927-37; 2192-2395.  The revised EA considered one no-action alternative to the Project.  AR 2211.  Plaintiffs and other concerned parties submitted timely comments.

On August 24, 2011, the BLM published a Notice of Sale for the Project.  AR 883-884.  In September 2011, Murphy, an Oregon wood products manufacturer, purchased the Project.  Murphy's Memo in Supp. of Mot. to Intervene, p. 5.  On April 18, 2012, plaintiffs appealed the approval of the project to the Interior Board of Land Appeals ("IBLA") and requested a stay of the decision.  AR 183-241.  The automatic stay expired in June 2012, and IBLA declined to issue a further stay.

Plaintiffs filed a complaint in this court on July 9, 2012, protesting the BLM's approval of the Project (#1).  On August 28, 2012, plaintiffs filed a motion for a preliminary injunction, seeking to halt the project (#14).  This motion was denied on October 9, 2012.  Soda Mountain Wilderness Council v. U.S. BLM, No. 1:12-CV-1171-CL, 2012 WL 4791435 (D. Or. Oct. 9, 2012).  Plaintiffs filed a motion for summary judgment on November 1, 2012 (#47).  On

---

[4] Because the Medford district is within the range of the NSO, the RMP incorporates the NWFP.

December 6, 2012, the BLM and Murphy filed separate cross-motions for summary judgment (#54, 56).

## OVERVIEW OF ARGUMENTS

Plaintiffs allege that the BLM violated NEPA by failing to (1) consider a reasonable range of alternatives to the Project, (2) take a hard look at the consequences of logging Douglas fir trees infected with mistletoe, and (3) adequately consider the cumulative effects of nearby planned timber sales. Plaintiffs also allege that the BLM violated FLPMA by contributing to the need to list the Pacific fisher as endangered under the Endangered Species Act ("ESA"). The BLM and Murphy contend that the BLM properly analyzed the Project's environmental consequences and complied with all applicable laws and regulations.

## EXTRA-RECORD MATERIALS

Before reaching the merits of the case, the court must first determine what evidence it can consider. Judicial review of agency decisions is generally limited to the administrative record the agency relied on in making its decision. Animal Def. Council v. Hodel, 840 F.2d 1432, 1436 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989). In a footnote in the Memorandum in Support of Plaintiffs' Motion for Summary Judgment (#49), plaintiffs request that the court take judicial notice of excerpts from five timber sale EAs or DRs attached to the Declaration of Sean Malone, none of which were included in the Administrative Record. Plaintiffs request that the court consider excerpts from the EAs for (1) the Conde Project, located in the South Fork Little Butte Creek Watershed (Malone Decl. Ex. D-4); (2) the Plateau Thin Project, located in the Howard Prairie and Grizzly-Soda drainages of the Jenny Creek Watershed (Malone Decl. Ex. C-3); (3) the Rio Climax Project, located in the Bear Creek Watershed (Malone Decl. Ex. E-3); and (4) the Sampson Cove Project, located in the Upper Bear Creek Watershed and the Walker

Creek, Lower Emigrant Creek, and Upper Emigrant Creek sub-watersheds (Malone Decl. Ex. A-2). Plaintiffs also request that the court consider an excerpt from the DR for the Shale City Project, located in the Bear Creek Watershed (Malone Decl. Ex. B). The BLM seeks an order striking these exhibits (#59).

"Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision." Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996) (*citing* Camp v. Pitts, 411 U.S. 138, 142 (1973), Nev. Land Action Ass'n v. U.S. Forest Serv., 8 F.3d 713, 718 (9th Cir. 1993)). However, review may be "expanded beyond the record if necessary to explain agency decisions." Animal Defense Council, 840 F.2d at 1436. The Ninth Circuit recognizes four exceptions where extra-record materials may be allowed: (1) if necessary to determine whether the agency considered all relevant factors and explained its decision; (2) when the agency relied on extra-record documents; (3) where supplementation is needed to explain or clarify technical matters involved in an agency action; and (4) where plaintiffs make a showing of agency bad faith. Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006). However, post-decision information "may not be advanced as a new rationalization either sustaining or attacking an agency's decision." Sw. Ctr. for Biological Diversity, 100 F.3d 1443, 1450 (9th Cir. 1996). The burden to prove that the extra-record documents fit within one of these exceptions falls on the plaintiff. Animal Def. Council, 840 F.2d at 1437.

Here, the court takes judicial notice of the excerpts from the Sampson Cove, Rio Climax, and Plateau Thin EAs and the Shale City DR under the first exception. Plaintiffs allege that the sales are so close to the Cottonwood Project that there is potential for cumulative effects, especially with regard to the Pacific fisher. The EAs and DR are necessary to establish the location of these

sales in relation to the Cottonwood Project to determine whether the BLM erred in its cumulative

effects discussion. The court declines, however, to take judicial notice of the Conde EA. As the

BLM points out, the Conde EA was issued in November 2011, while the Cottonwood EA was

issued in August 2011. The BLM could not have considered a document that was not in

existence at the time the Cottonwood Project decision was made. Accordingly, the BLM's

motion to strike is granted as to the Conde EA only.

## LEGAL STANDARDS

### I.  APA

Judicial review of agency decisions under NEPA and FLPMA is governed by Section 706 of

the APA and may be resolved through motions for summary judgment. City of Sausalito v.

O'Neill, 386 F.3d 1186, 1205 (9th Cir. 2004) ("Because the statutes . . . do not contain separate

provisions for judicial review, our review is governed by the APA"); Idaho Sporting Cong., Inc.

v. Rittenhouse, 305 F.3d 957, 964 (9th Cir. 2002). Under the APA, the court may set aside a

final agency action only where the action is arbitrary, capricious, an abuse of discretion, or not

otherwise in accordance with the law. 5 U.S.C. § 706(2)(A). Review under the APA is

"searching and careful." Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 858

(9th Cir. 2004). However, the court may not substitute its own judgment for that of the agency.

Id. Instead, a court:

> [W]ill reverse a decision as arbitrary and capricious only if the agency relied on
> factors Congress did not intend it to consider, entirely failed to consider an
> important aspect of the problem, or offered an explanation that runs counter to the
> evidence before the agency or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1176-1177 (9th Cir. 2011) (*quoting* Lands

Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *overruled on other grounds by*

Case 1:12-cv-01171-CL    Document 83    Filed 05/29/13    Page 8 of 24

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)).  "Agency action is valid if the

agency 'considered the relevant factors and articulated a rational connection between the facts

found and the choices made.'"  Lands Council v. McNair, 629 F.3d 1070, 1074 (9th Cir. 2010)

(*quoting* Arrington v. Daniels, 516 F.3d 1106, 1112 (9th Cir. 2008)).

**II.    NEPA**

"NEPA is 'our basic national charter for protection of the environment.'"  Klamath-Siskiyou

Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004) (*quoting* 40 C.F.R. § 1500.1(a)).

NEPA is a procedural statute that requires federal agencies, such as the BLM, to assess the

environmental consequences of major actions before those actions are undertaken.  NEPA has

two purposes: (1) ensure that federal agencies take a "hard look" at environmental consequences

to agency actions, and (2) guarantee that the public has access to relevant information.

Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

If a federal agency determines that a proposed action will significantly affect the

environment, NEPA generally requires the agency to prepare an EIS.  42 U.S.C. § 4332(c);

Klamath-Siskiyou Wildlands Ctr., 387 F.3d at 993.  To determine if the environmental impact of

a proposed action is significant enough to warrant an EIS, federal regulations permit an agency

to conduct an EA, which is less exhaustive than an EIS.  40 C.F.R. § 1508.9.  An EA is a

"concise public document that briefly provide[s] sufficient evidence and analysis for determining

whether to prepare an environmental impact statement or a finding of no significant impact."  Id.

An EA must "include brief discussions of the need for the proposal, or alternatives [to the

proposed action], [and] of the environmental impacts of the proposed action and alternatives."

Id.  In this analysis, the agency preparing an EA must consider "the direct, indirect, and

cumulative impacts of the action."  Ctr. For Envtl. Law & Policy v. U.S. Bureau of Reclamation,

655 F.3d 1000, 1006 (9th Cir. 2011) (*citations omitted*).  If after preparing the EA, the agency

determines that an EIS is not required, the agency must issue a FONSI.  40 C.F.R. § 1501.4(e).

The FONSI should briefly state why the proposed action will not have a significant impact on the

human environment.  40 C.F.R. § 1508.13.

NEPA is accompanied by implementing regulations promulgated by the Council on

Environmental Quality ("CEQ"), found at 40 C.F.R. §§ 1501.1 – 1508.28.  These regulations

should be construed consistently with the policies embodied in NEPA "to the fullest extent

possible."  <u>Klamath-Siskiyou</u>, 387 F.3d at 993 (*citation omitted*).

### III.    FLPMA

FLPMA establishes standards for public land use planning and obligates the BLM to manage

its lands under principles of multiple use.  43 U.S.C. § 1732(a).  FLPMA requires the Secretary

of the Interior to "develop, maintain, and when appropriate, revise land use plans which provide

by tracts or areas for the use of the public lands."  43 U.S.C. § 1712(a).  In accordance with

FLPMA, the BLM is required to conduct district-level planning to guide public land maintenance

and development.  The district-level plan in this case, the Medford District Land RMP, was

approved in June 1995, and is subject to the NWFP.  AR 20044, 20052.  Failure of a project to

comply with the RMP is a violation of FLPMA and its implementing regulations.

### DISCUSSION

### I.    Range of Alternatives

In reference to NEPA, Plaintiffs first argue that the EA is arbitrary and capricious because

the BLM failed to consider a reasonable range of alternatives to the Project.  Specifically,

plaintiffs contend that the BLM should have considered an alternative that did not involve road

construction.

NEPA requires that the BLM "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The key determination is whether the agency's "selection and discussion of alternatives fosters informed decision-making and informed public participation." Westlands Water Dist. v. U.S. Dep't of Interior, 376 F.3d 853, 872 (9th Cir. 2004) (citing Cal. v. Block, 690 F.2d 753, 767 (9th Cir. 1982)). "[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." Ctr. for Biological Diversity v. Salazar, 695 F.3d 893, 915 (9th Cir. 2012) (quoting Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005)). "Where with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' see 40 C.F.R. § 1502.14(a), with an EA, an agency is only required to include a brief discussion of reasonable alternatives." Ctr. for Biological Diversity, 695 F.3d at 915, quoting N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1153 (9th Cir. 2008). That is, for an EA, an agency need not discuss "alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for management of the area." Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs, 524 F.3d 938, 955 (9th Cir. 2008) (internal citation omitted). Additionally, an agency has discretion to determine which alternatives to analyze in-depth. Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 551 (1978).

In this case, the BLM considered the alternative that did not include any road construction, but eliminated it from detailed consideration because it did not meet the objectives and needs of the Project. AR 2245. The RMP requires that all silvicultural systems be economically practical. The EA states that the no-road alternative would be too expensive to be viable, noting that tractor logging for a sample of three units would cost approximately $110,000, while

helicopter logging without road construction for the same area would cost $365,000. AR 2245-46. The EA then concludes that using the no-road alternative would not meet the RMP's requirements for economically viable projects, stating, "[r]equiring helicopter yarding of these units would have resulted in dropping units from proposed harvesting and would not have been consistent with RMP direction for managing units for sustained timber production." AR 2246.

Plaintiffs argue that the fact that several units only accessible by helicopter would be dropped if the no-road alternative were used is not grounds for dismissing this alternative altogether. Plaintiffs point out that the BLM deferred around ten units between the preparation of the EA and the DR, arguing that if this decision did not render the Project economically infeasible, then using helicopter yarding and subsequently dropping several units should also be permitted.

The court finds that the BLM's alternative analysis was not arbitrary and capricious. In issuing an EA, an agency does not need to discuss alternatives that are "inconsistent with the basic policy objectives for management of the area." Bering Strait, 524 F.3d at 955; *see also* Barnes v. U.S. Dep't of Tranp., 655 F.3d 1124, 1136 (9th Cir. 2011), *citing* Native Ecosystems Council, 428 F.3d 1233, 1246-47 (9th Cir. 2005) ("[An EA] need only discuss alternatives that advance the purpose of the project"). While the BLM did drop a number of units between the time the EA and DR were issued, the BLM's decision, which states that dropping specific units due to helicopter yarding does not render the Project economically infeasible, is entitled to deference. Additionally, managing units for sustained timber production and providing a transportation system are two key goals to the Project.[5] The no-road alternative would be

---

[5] The section of the EA entitled "Need for the Proposed Cottonwood Project" states: "There is a need to provide a transportation (road) system within the Cottonwood Project Area that provides access for the management of resource program areas (RMP p. 86) including timber resources, while reducing their effects on water, soils, fish, and wildlife...The Medford District RMP provides direction for road management to 'Develop and maintain a transportation system that serves the needs of users in an environmentally sound manner' (RMP p. 84)." AR 2204.

financially infeasible and contradicts the BLM's objective of developing and maintaining a transportation system in the area.

## II.    Mistletoe-Infected Trees

Plaintiffs also argue that the BLM violated NEPA by failing to take a hard look at the consequences of logging mistletoe-infected Douglas fir trees.[6] The EA states that some mistletoe-infected trees will be removed, but contends that the removal will be limited enough that wildlife habitat will not be significantly harmed.  Plaintiffs argue that there is no basis for this conclusion because the EA does not state the specific number or location of mistletoe-infected trees that will be logged.

NEPA requires that the BLM take a "hard look" at the likely effects of a proposed action. Native Ecosystems Council, 428 F.3d at 1239; Pac. Rivers Council v. U.S. Forest Serv., 689 F.3d 1012, 1024 (9th Cir. 2012).  Taking a "hard look" involves "considering all foreseeable direct and indirect impacts" of a project.  N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 975 (9th Cir. 2006) (*internal quotation marks omitted*).  That is, an EA must "involve a discussion of adverse impacts that does not improperly minimize negative side effects."  Native Ecosystems Council, 428 F.3d at 1241.  However, an EA need not "compile an exhaustible examination of each and every tangential event that could impact the local environment."  Tri-Valley CARES v. U.S. Dep't of Energy, 671 F.3d 1113, 1129 (9th Cir. 2012).  Rather, an EA should "create a workable public document that *briefly* provides evidence and analysis for an agency's finding regarding an environmental impact."  Id., *citing* 40 C.F.R. § 1508.9; League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1136 (9th Cir. 2010).

---

[6] Douglas fir dwarf mistletoe is a parasitic plant that infects Douglas fir trees. AR 2309. Infections appear in the form of bunched growths of branches. AR 2323. While heavy infections can result in growth loss and mortality to the tree, the bunched growths of branches serve as nest platforms for a variety of animals. AR 2323, 2291, 2289.

In this case, the EA provided adequate guidance regarding mistletoe infections. The EA explains that the Project uses a mistletoe rating system, which designates infected trees for harvest if the trees are heavily infected and if canopy cover retention standards are not compromised. AR 2222-23, 2315. The silviculture prescriptions explain:

> Where mistletoe is encountered, target heavily infected trees for removal first, then, focus on leaving resistant species (sugar pine, ponderosa pine, incense cedar, and white fir), followed by uninfected or the least infected Douglas-fir trees with infections confined to the lower third of the tree (Douglas-fir Mistletoe Rating [DMR] Rating 1-2, Figure 202). Dwarf mistletoe infected trees may be marked for treatment if prescribed canopy cover retention for the stand is not compromised.

AR 2222. In addition to providing the rating system, the EA also states that some trees next to heavily-infected trees may be harvested in an effort to control the spread of mistletoe:

> These stand level treatments aim to strategically retain trees that have the least likelihood of contracting the disease and remove the trees that might have "latent infections", due to their proximity of trees with visual symptoms. These stand level prescriptions promote the removal of the most severely infected trees and selects tree to remove that are the least likely to create a greater sunlight environment around the least infected tree crowns.

AR 2392. Plaintiffs argue that the fact that the EA allows for removal of "trees that might have 'latent infections'" means that potentially *any* tree could be removed from the Project area. Plaintiffs quote the holding from Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998) that "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided," arguing that the BLM should have specified the number of trees that would be harvested.

The BLM's treatment of mistletoe-infected trees provides the requisite "hard look" under NEPA. While the EA does not identify the precise amount of trees to be harvested, the EA explains why providing a hard number of trees to be logged is not practical:

> Silvicultural prescriptions are designed to address the desired conditions at the
> stand level.  Collecting data or information on the presence of every tree in a
> stand that has a sign or symptom or mistletoe disease would not be practical nor
> would it lead to a better decision concerning the management of mistletoe within
> stands.

AR 2392.  The EA is clear that not all mistletoe will be removed: the EA states that

"silvicultural prescriptions are designed to slow the spread of [mistletoe], rather than eradicate

the parasite."  Id.  In addition, the EA does not allow for the removal of *any* tree that could have

a latent infection, but only those that are next to the most severely infected trees.  Id.  The BLM

was not required to provide a specific number of mistletoe-infected trees that would be

harvested, and the EA provides appropriate guidelines for dealing with mistletoe-infected trees.

The impact of the removal of mistletoe-infected tree is also adequately discussed in the EA.

The EA states that "[g]iven that mistletoe removal will occur only occasionally throughout this

project, the overall effects of such removal are anticipated to be small."  AR 2388.  Likewise, the

EA states that "[m]istletoe is common throughout the project area, watershed and surrounding

watersheds.  The limited removal of select trees with mistletoe will not significantly change the

availability of mistletoe structure for use by wildlife species in these areas," and notes that

"[s]uitable nesting structure is retained within units through retention of large dominant trees

infected with mistletoe."  AR 2374, 2294.  The EA also notes that habitat for owls and raptors

will be protected – the Project complies with the RMP and the Northern Spotted Owl Recovery

Plan, and requires that all complex mature and old growth stands be set aside from timber

harvest.  AR 2203, 2245.  While plaintiffs request a more detailed analysis, NEPA requires that

the agency "*briefly* provide[ ] evidence and analysis for an agency's finding regarding an

environmental impact."  Tri-Valley CARES, 671 F.3d at 1129.  The court finds that the EA

meets this standard in regard to the potential environmental impacts of harvesting mistletoe-infected trees.

### III.    Cumulative Impacts

Plaintiffs also argue that the BLM violated NEPA by failing to adequately consider the cumulative impact of nearby planned timber sales. BLM and Murphy contend that the Project EA contains an adequate analysis of the sales in the selected area for analyzing cumulative impacts.

Pursuant to NEPA, federal agencies must analyze the cumulative environmental impacts of major federal actions. 42 U.S.C. § 4332(c); Barnes, 655 F.3d at 1141. A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions…Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. The consideration of past, present, and reasonably foreseeable future actions must contain enough quantified or detailed information to allow for a "useful analysis." Kern v. U.S. BLM, 284 F.3d 1062, 1075 (9th Cir. 2002) (*citing* Muckleshoot Indian Tribe v. U.S. Forest Serv.*,* 177 F.3d 800, 810 (9th Cir. 1999)).

In reviewing EAs for timber sales, the need for a comprehensive cumulative impact analysis is particularly pronounced. "As we have previously emphasized when considering the sufficiency of a timber sale EA, without a consideration of individually minor but cumulatively significant effects, 'it would be easy to underestimate the cumulative impacts of the timber sales…, and of other reasonably foreseeable future actions, on the [environment].'" Native Ecosystems Council v. Dombeck, 304 F.3d 886, 896 (9th Cir. 2002) (*quoting* Kern, 284 F.3d at 1078). However, an EA need not discuss all potential cumulative impacts in detail. *See* Tri-

<u>Valley CARES</u>, 671 F.3d at 1128 ("The purpose of an EA under NEPA is not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to '[b]riefly provide sufficient evidence for determining whether to prepare an environmental impact statement or a finding of no significant impact'" (*citations omitted*)).

In this case, the analysis area for cumulative effects in general is the Keene Creek sub-watershed, located in the western part of the Jenny Creek watershed. AR 2259. The Project EA's analysis of water resources mentions the Sampson Cove Project, which has six acres that slop over the drainage divide from the Bear Creek watershed into the Keene Creek sub-watershed. In reference to these six acres, the EA concludes that there would not be a cumulative impact on water resources:

> These [Sampson Cove] units are near the ridge top, do not include any stream channels or Riparian Reserves, and would leave a minimum of between 40 – 60% canopy cover following harvest. Because they do not have any hydrological connectivity with aquatic habitat in the Keene Creek subwatershed, and because they would retain sufficient canopy cover to negate the possibility to altering peak or base flows, these units would have not causal mechanism to affect aquatic habitat in Keene Creek. As such, harvest of these units would not have any direct or indirect effects, would not contribute to an increased risk for cumulative effects within the analysis area.

AR 2266. When discussing the impact of the Sampson Cove Project on special status plants and noxious weeds, the EA states:

> There are no documented sites of special status species or noxious weeds within the Cottonwood Forest Management Project units (Units 32-4A and 32-B) or associated roadways (Roads 39-3E-32 and -32.1) that would be affected by proposed project activities in the neighboring Sampson Cove Forest Management units. With the implementation of designated project design features in both projects, there would be no effect on botanical resources related to the proximity of these two projects and therefore no potential for adverse cumulative effects to botanical resources as a result of implementing the Sampson Cove and Cottonwood Forest Management Projects.

AR 2344. In reference to wildlife, the EA states:

> Because the Cottonwood Project is designed to maintain existing spotted owl
> nesting, roosting, and foraging and dispersal habitat treated, and because the
> Sampson Cove Project was designed to maintain existing spotted owl, nesting
> roosting, foraging and dispersal habitat within the home ranges of known spotted
> owl sites, there is no potential for either project to contribute to significant
> adverse cumulative effects to the spotted owl.

AR 2304.  Plaintiffs object to this analysis, arguing that the treatment of the Sampson Cove

Project is too cursory, that the Project EA should have also discussed the Shale City, Plateau

Thin, and Rio Climax projects, [7] and that the Project EA should have considered the cumulative

effects as to additional resources, such as the impact on the Pacific fisher and soil resources.

The court finds that the BLM's cumulative impact analysis was not in error.  An EA's

analysis of cumulative impacts may be brief.  40 C.F.R. § 1508.9(b).  Here, the Project EA

succinctly discussed the Sampson Cove Project.  The EA states that only six units overlapped

into the Cottonwood Project analysis area, and concluded that these units would not have a

cumulative effect due to canopy cover retention and their lack of hydrological connectivity with

the rest of the Keene Creek sub-watershed.  As to special status species or noxious weeds, the

EA explains that there are no documented sites of special status species or noxious weeds within

the Cottonwood Project or associated roadways that would be affected by activities in the

Sampson Cove Project units.  AR 2344.  In reference to the spotted owl, the EA states that both

the Sampson Cove and the Cottonwood Project would retain a canopy cover of 40 – 60%

following harvest.  AR 2249, 2304.

Plaintiffs argue that the cumulative effects discussion is comprised primarily generalized

conclusions, contending that this case is similar to Te-Moak Tribe of Western Shoshone v. U.S.

Dep't of Interior, where the Ninth Circuit noted that statements such as "[i]mpacts are being

---

[7] In their memo in support of their motion for summary judgment, plaintiffs also argue that the Project EA should have analyzed the Conde Project EA.  Because the court has granted the BLM's motion to strike the Conde Project EA, however, and the Administrative Record contains no reference to this project, the court declines to consider this argument.

avoided by project design" is inadequate for a cumulative effects analysis. 608 F.3d 592, 604 (9th Cir. 2010). In this case, however, the EA explains *how* the project design would reduce or eliminate impacts in reference to spotted owl and aquatic habitat. The cumulative effects analysis regarding the Sampson Cove Project, while brief, was appropriate.

In reference to the Shale City, Plateau Thin, and Rio Climax projects, the court finds that these projects did not need to be discussed in the cumulative effects analysis. The Cottonwood Project is located in the Keene Creek sub-watershed, while the Shale City, Plateau Thin, and Rio Climax Projects are all located in separate watersheds and had no units that overlapped with the Keene Creek sub-watershed. [8] Though plaintiffs argue that the cumulative effects analysis area should have been larger and included the area for these projects, the BLM's decision to use the Keene Creek watershed is entitled to deference by this court. While "the choice of an analysis scale must represent a reasoned decision and cannot be arbitrary," Idaho Sporting Congress v. Rittenhouse, 303 F.3d 957, 973 (9th Cir. 2002) (*citations omitted*), courts generally defer to an agency's determination an analysis scale for analyzing cumulative effects. Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002) (*citing* Kleppe v. Sierra Club, 427 U.S. 390, 413-414 (1976). Here, the BLM adequately explained its decision to use the Keene Creek sub-watershed as the cumulative effects analysis area. AR 2259-60. Accordingly, the court defers to the BLM's determination and finds that the BLM did not err in excluding a discussion of projects outside the cumulative impact analysis area.

Plaintiffs also argue that the BLM should have considered the cumulative effects of the Project on additional issues, such as sedimentation in streams, carbon storage, and the impact on

---

[8] The Cottonwood Project EA analysis area is the Keene Creek sub-watershed in the western portion of the Jenny Creek Watershed. AR 2259-61. In contrast, the Shale City Project is located in the Bear Creek Watershed (Malone Decl., Ex. B), the Plateau Thin Project is located in the Howard Prairie and Grizzly-Soda drainages of the Jenny Creek Watershed (Malone Decl. Ex. C-3), and the Rio Climax Project area is located in the Bear Creek Watershed (Malone Decl., Ex. E-3)

fungi. The court disagrees. An EA need not "compile an exhaustible examination of each and every tangential event that could impact the local environment." Tri-Valley CARES , 671 F.3d at 1129. Rather, an EA should "create a workable public document that *briefly* provides evidence and analysis for an agency's finding regarding an environmental impact." Id.; *see also* League of Wilderness Defenders Blue Mountains Biodiversity, 615 F.3d at 1136 (NEPA review "must concentrate on the issues that are truly significant to the action…rather than amassing needless detail") (*citing* 40 C.F.R. § 1500.1(b)). In this case, the BLM's cumulative effects analysis necessarily focused on major issues.

### IV.    Pacific Fisher

Plaintiffs also allege that the BLM violated FLPMA because the Project is inconsistent with the RMP. Plaintiffs argue that the project will contribute to the need to list the Pacific fisher ("fisher") as endangered and inhibit its recovery, in violation of the RMP's requirements.

Pursuant to FLPMA, the BLM is required to follow the applicable district's RMP. 43 U.S.C. § 1732(a); 43 U.S.C. § 1712. RMPs contain direction by which "present and future use is protected." 32 U.S.C. § 1701(a)(2); Norton v. S. Utah Wilderness Alliance ("SUWA"), 542 U.S. 55, 66 (2004). The Medford RMP states that the BLM must "[m]anage for the conservation of Federal candidate and Bureau-sensitive species and their habitats so as not to contribute to the need to list and to contribute to the recovery of the species," and requires the BLM to change or abandon actions that contribute to the need to list candidate species. AR 22770-71. The BLM manual requires that "actions requiring authorization or approval by BLM be consistent with the conservation needs of [special status species] and not contribute to the need to list any [special status species]." AR 18530-32, *citing* BLM Manual Section 6840 (July 2008).[9]

---

[9] The BLM manual is available online at
http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/blm_manual.html.

The fisher species is a candidate for listing as "endangered" under the ESA.  AR 9138-60.

Fishers have been detected in the Project area, though the number of fishers in the Project area is

unknown.  AR 2290.  The BLM concluded that the Project would not contribute to the need to

list the fisher because habitat features such as large snags and coarse woody material would be

retained throughout the Project area.  AR 2298.

### A.  NSO Habitat as Proxy for Fisher Habitat

Plaintiffs first argue that the methodology the BLM relied on to determine the Project's

impact on the fisher is flawed.  In predicting the impact of the Project on the fisher, the BLM

relied on NSO habitat, citing to the case Klamath-Siskiyou Wildlands Ctr. v. BLM, No. 06-3076-

PA, 2007 WL 2688125 (D. Or. Sept. 10, 2007), where the court upheld the BLM's use of NSO

habitat as a surrogate for fisher habitat.  AR 2371.  Plaintiffs contend that Klamath-Siskiyou is

inapposite, because in Klamath-Siskiyou, fishers were not found in the area and the claim at

issue arose under NEPA, not FLPMA.  Plaintiffs also contend that recent scientific studies have

shown that NSO habitat is insufficiently correlated with fisher habitat.

The court finds that the BLM's reliance on Klamath-Siskiyou was proper.  While plaintiffs

attempt to distinguish this case on the basis that fishers have been located in the area, the court

did not rely on the absence of fishers in Klamath-Siskiyou to justify using NSO habitat as a

proxy.  Rather, the court in Klamath-Siskiyou noted that both animals prefer old-growth habitat

and that the BLM had the discretion to use NSO habitat as a proxy.  Klamath-Siskiyou, 2007 WL

2688125 at *2, 6.  In this case, the Project EA justifies its decision to use NSO habitat as a proxy

for fisher habitat, stating that high canopy cover, multi-storied stands, large stands, large snags,

and large downed trees are key habitat features for both animals.  AR 2290.  Moreover, while

plaintiffs cite a 2006 study finding that NSO and fisher habitat in northern California is only

"moderately correlated," the BLM cites studies that support using NSO habitat as a surrogate for fisher habitat. AR 13372, 13385-86, 13389. Deference to an agency's scientific analysis is appropriate. *See* <u>Marsh v. Or. Natural Res. Council</u>, 490 U.S. 360, 377 (1978) ("[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *see also* <u>SUWA</u>, 542 U.S. at 66 (FLMPA gives the BLM "a great deal of discretion in deciding how to achieve" compliance with a district RMP).

## B. Coarse Woody Material, Snags, and Canopy Closure

Plaintiffs contend that the Project will contribute to the need to list the fisher by reducing its habitat. The fisher prefers forest floors with large amounts of coarse woody debris and snags, which fisher use for dens, and areas with significant canopy closure. The EA states that fisher populations have declined on federal lands in old-growth habitat due to past timber harvests. AR 9146. Plaintiffs contend that the Project's timber harvest and fuels reduction will further harm fisher habitat.

While past timber harvests reduced available fisher habitat, the current Project is distinguishable from past projects. The EA acknowledges that features of past timber harvest, such as clear-cutting, broadcast burning, and poor road placement in past timber harvests caused habitat damage. AR 2255. In contrast to these projects, however, the Cottonwood Project does not involve clear-cutting or broadcast burning, and addresses erosion concerns through the use of low gradient roads with drainage features. AR 2279. The EA also states that coarse woody material and snags should remain on site and that snags of varying sizes and decay classes should be retained: project design features provide that at least three snags 17" and larger should be

retained per acre, and large, broken-top trees and large snags with loose bark should be left
undisturbed.  AR 2225, 2231, 2227, 2298, 2222.

The Project EA also sufficiently addresses canopy closure.  Plaintiffs cite a study from the
Southern Sierra Nevada area for the principle that "the most consistent predictor of fisher
occurrence at large spatial scales [is] moderate to high amounts of contiguous canopy cover,"
Pltf. Memo, p. 12 (*quoting* AR 6369), arguing that reduction in canopy closure will significantly
harm fisher habitat.  However, the Project states that a minimum of 60% of canopy closure in
NSO nesting, roosting, and foraging habitat will be maintained, and that approximately 40%
canopy closure will be maintained elsewhere in the Project.  AR 2220.  In sum, while canopy
cover will be reduced in some areas, it will be retained at levels that support the fisher.
Moreover, the Project's selective thinning will accelerate the growth of large trees in the Project
area, encouraging canopy cover in the future.  AR 2220, 2314.  FLPMA gives the BLM "a great
deal of discretion in deciding how to achieve" compliance with an RMP.  SUWA, 542 U.S. at
66.  Here, the BLM's decisions regarding coarse woody material, snags, and canopy closure
demonstrate that key habitat characteristics will be maintained.  While plaintiffs may disagree
with the how the BLM complies with the RMP's requirement that the Project not contribute to
the need to list the fisher, the BLM's methodology is entitled to deference.

### C.  Mistletoe Retention

Plaintiffs also argue that the removal of mistletoe-infected trees will contribute to the need to
list the fisher.  The best quality nesting, roosting, and foraging habitat are mistletoe platforms,
and fisher rest sites are associated with trees infected with mistletoe.  AR 2289, 6394.  Plaintiffs
argue that the Project's mistletoe-infected tree standards are so vague that potentially all infected
trees would be removed, leading to the destruction of the most suitable nesting, roosting, and

foraging habitat. As analyzed above, however, the Project provides clear guidance on mistletoe

tree retention, stating that the most severely infected trees or those close to severely infected

trees will be targeted for harvest. AR 2392. The EA is clear that the Project "does not attempt to

eradicate dwarf mistletoe from the landscape; rather it attempts to minimize it in specific areas."

AR 2323. The EA also addresses the specific issue of nesting, stating that the EA ensures that

"[s]uitable nesting structure [will be] retained." AR 2294. These guidelines demonstrate the

Project will retain mistletoe at such a level that the fisher's habitat will not be harmed.

**D. Road Density**

Plaintiffs also contend that road construction and reconstruction will fragment fisher habitat.

The Project includes 1.15 of permanent road construction, 0.6 miles of temporary road

construction, and 1.9 miles of decommissioning of existing roads. AR 928.

While some habitat fragmentation will occur in the short term, the court agrees with the BLM

that the Project actually contributes to the recovery of the fisher in the near future. Road

construction will occur in only 2% of the denning and resting habitat in the analysis area, and the

Project contains design feature to minimize disturbance to seasonal wildlife. AR 2298, 2297,

2230, 2298, 2390. More importantly, because the Project involves decommissioning 1.9 miles of

roads, the Project ultimately creates a 0.75 miles net reduction in road density in the analysis

area. While plaintiffs correctly argue that fisher habitat will be reduced in the short term, the

court is mindful of the fact that the BLM has "a great deal of discretion in deciding how to

achieve" compliance with a district's RMP. S. Utah Wilderness Alliance, 542 U.S. at 66; *see*

*also* Gardner v. U.S. BLM, 633 F.Supp.2d 1212, 1224 (D. Or. June 15, 2009) (the BLM may

choose the appropriate manner for achieving RMP objectives). In the near future, the Project

increases the amount of available fisher habitat. The EA's prescriptions regarding road density are in accordance with the RMP.

## CONCLUSION

For the reasons stated above, the court concludes that the Cottonwood Project prepared by the BLM complies with NEPA and FLPMA.

## RECOMMENDATION

Based on the foregoing, the court grants in part and denies in part the BLM's motion to strike (#59); and recommends that plaintiffs' motion for summary judgment (#47) be denied, and BLM's cross-motion for summary judgment (#54) and Murphy's cross-motion for summary judgment (#56) be granted

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of the district court's judgment or appealable order. The Report and Recommendation will be referred to a district judge. Objections to this Report and Recommendation, if any, are due 14 days from today's date. If objections are filed, any response to the objections is due 14 days from the date of the objection. *See* FED. R. CIV. P. 72, 6.

DATED this _____ day of May, 2013.

_____
MARK D. CLARKE
United States Magistrate Judge