Marianne Dugan (OSB # 93256)
Attorney at Law
259 E. 5th Ave., Ste 200-D
Eugene, OR 97401
Tel. (541) 338-7072
Fax. (866) 650-5213
mdugan@mdugan.com

Sean T. Malone (OSB # 084060)
Attorney at Law
259 E. 5th Ave., Ste 200-G
Eugene, OR 97401
Tel. (303) 859-0403
Fax. (650) 471-7366
seanmalone8@hotmail.com

Of Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

SODA MOUNTAIN WILDERNESS COUNCIL; OREGON WILD; KLAMATH SISKIYOU WILDLANDS CENTER; CENTER FOR BIOLOGICAL DIVERSITY; and CASCADIA WILDLANDS,

Plaintiffs,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT

Defendant,

and

MURPHY COMPANY,

Intervenor-Defendant.

**No. 12-cv-01171-CL**

PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATIONS

## INTRODUCTION

Plaintiffs respectfully submit the following objections to the Findings and Recommendations (F&R) (Dkt # 83) issued in the above-titled case for Plaintiffs' challenge to the Cottonwood Forest Management Project (Cottonwood timber sale) Environmental Assessment (EA), Finding of No Significant Impact (FONSI), and Decision Record (DR).

## STANDARD OF REVIEW

Courts review *de novo* the Magistrate Judge's F&R 28 U.S.C. § 636(b); McDonnell Douglas Corp. v. Commodore Bus., 656 F.2d 1309, 1313 (9th Cir. 1981). Federal Rule of Civil Procedure 56 allows entry of summary judgment if "there is no genuine issue of material fact and…the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court encourages district courts to utilize summary judgment in appropriate cases. Celotex Corp. v. Catrett, 477 U.S. 317, 322-27 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986).

Judicial review of agency actions involving the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA) is governed by § 706 of the Administrative Procedure Act (APA). 5 U.S.C. § 706. Pursuant to the APA, this court shall hold unlawful agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as those actions taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Review of final agency action is narrow; however, the agency must articulate a rational connection between the facts found and the conclusions made. See Envtl. Def. Ctr. v. EPA, 319 F.3d 398, 428 n.46 (9th Cir. 2003). The reviewing court must determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Marsh v. Or. Natural Res. Council, 490 U.S.

360, 378 (1989); Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1097 (9th Cir. 2003). The arbitrary and capricious standard does not shield agency action from a "thorough, probing, in-depth review" of those actions. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971). "Courts must not 'rubber stamp the agency decision as correct.' Rather, the reviewing court…must engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'" Northern Spotted Owl v. Hodel, 716 F.Supp. 479, 482 (W.D.Wash. 1988) (internal citations omitted). Finally, this Court can uphold BLM's decision only on the basis of the reasoning found in those decisions; the reviewing court cannot substitute reasons for agency action that are not in the record. Anaheim Mem'l Hosp. V. Shalala, 130 F.3d 845, 849 (9th Cir. 1997).

**ARGUMENT**

Plaintiffs object to the Magistrate's findings and recommendations with regard to all claims, except the Magistrate Judge's decision on Federal Defendant's motion to strike. Dkt # 83 at 5-7.

I. BLM failed to consider a reasonable alternative

"'NEPA requires that alternatives … be given full and meaningful consideration,' whether the agency prepares an EA or an EIS." Ctr. for Biological Diversity v. Nat'l Hwy Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008) (quoting Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1239 (9th Cir. 2005). Reasonable alternatives are viable, feasible, and meet the stated goals of the project, Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992), and "[t]he existence of a viable but unexamined alternative renders an [EIS] inadequate." Citizens for a Better Henderson v. Hodel, 768 F.2d 1051, 1057 (9th Cir. 1985).

Here, Plaintiffs proposed an alternative that would avoid road construction in the Jenny

Creek watershed.[1] Doing so would have required BLM to defer three (3) logging units, totaling approximately 127 acres. AR-2212-13 (units 28-3, 20-2, 20-1 equal 127 acres). BLM, however, refused to analyze this alternative in detail because BLM alleged it would be uneconomical and unsustainable in violation of RMP standards.[2] AR-2245-46 (BLM's rationale).

BLM's rationale is specious because BLM's final chosen alternative in their DR deferred more than ten (10) units for an approximate total of 383 acres. Compare AR-2212-13 (EA totaling 1,108 acres) with AR-929 (DR totaling 725 acres). This reduction in units and acreage is greater than that in Plaintiffs' proposed alternative; yet the BLM did not find that reduction to be uneconomical and unsustainable. This demonstrates that BLM's rationale was simply a pretense to dismiss Plaintiffs' proposed alternative. If BLM's final chosen alternative in the DR was reasonable, then Plaintiffs' alternative was also reasonable, and "[t]he existence of a viable but unexamined alternative renders [a NEPA analysis] inadequate." Hodel, 768 F.2d at 1057. Thus, BLM failed to give full and meaningful consideration to all reasonable alternatives.

The Magistrate cited to Barnes v. U.S. Dep't of Transp., 655 F.3d 1124, 1136 (9th Cir. 2011), citing Native Ecosystems Council, 428 F.3d at 1246-47, for the proposition that an EA "need only discuss alternatives that advance the purpose of the project." Dkt # 83 at 11. This proposition does not apply to the present case because deferring three (3) units is not contrary to the two objectives relied upon by BLM: that the project be economical and sustainable. See AR-2245-46. This is evident in the agency's decision to defer more units and acreage than under Plaintiffs' proposed alternative. Plaintiffs' proposed alternative was reasonable, and BLM

[1] Plaintiffs proposed this alternative because the Jenny Creek watershed is a Tier 1 Key Watershed under the Northwest Forest Plan, AR-2206, with a very high density of roads. AR-13117, 13162-64, 13168; AR-13117 (sedimentation is a "major problem"); AR-13174 (0.5 of 76.5 perennial stream miles are "in proper functioning condition").

[2] BLM did not argue in its EA, FONSI, or DR that such the proposed alternative was inconsistent with the timber sale's need to maintain a transportation system.

should have given it full consideration.

The Magistrate also concluded that Plaintiffs' proposal was contrary to the

> need to provide a transportation (road) system within the Cottonwood Project Area that provides access for the management of resource program areas (RMP p.86) including timber resources,…. The Medford District RMP provides direction for road management to 'Develop and maintain a transportation system that serves the needs of users in an environmentally sound manner' (RMMP p.84).

AR-2204. First, the agency did not present this as a rationale to dismiss Plaintiffs' proposed alternative, and it is well established that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." SEC v. Chenery, 332 U.S. 194, 196 (1947) (emphasis added); see also ONDA v. BLM, 531F.3d 1114, 1141 (9th Cir. 2008). Second, assuming *arguendo* that the Magistrate did not uphold the agency action based on a *post-hoc* rationalization, the project improves and utilizes approximately 36 miles of existing roads. AR-928. This clearly "develops and maintains" the forest's transportation system, consistent with the purpose and need of the project.

Therefore, the Magistrate's conclusion that the "no-road alternative would be financially infeasible and contradicts the BLM's objective of developing and maintaining a transportation system in the area" is not supported by the record and is based on BLM's *post-hoc* rationalization.

II. BLM failed to take a hard look at the impacts from logging trees with mistletoe

BLM failed to take a hard look at the impacts of logging trees with mistletoe because BLM did not disclose even an estimate of the number of such trees to be logged, their location, or the site-specific impacts of logging them. It is unclear whether 50 or 5,000 trees with mistletoe will be logged given BLM's vague discussion.

BLM must take a hard look at the environmental consequences of its actions under NEPA. A hard look includes "considering all foreseeable direct and indirect impacts," Idaho Sporting Congress v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002), and requires BLM to "undertake a thorough environmental analysis before concluding that no significant impact exists." Native Ecosystems Council, 428 F.3d at 1239. A hard look "involve[s] a discussion of adverse impacts that does not improperly minimize negative side effects." Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1159 (9th Cir. 2006) (quoting Native Ecosystems Council, 428 F.3d at 1241).

Mistletoe-infected trees provide a significant benefit to biodiversity and stand structure. See AR-6384 (candidate species "fisher rest sites were positively associated with the abundance of trees that had rust brooms and mistletoe"); AR-6385 ("When resting in live trees, fishers were observed using deformities associated with mistletoe and broom rust infections…."); AR-2323 ("benefits of dwarf mistletoe as wildlife habitat and a food source are well known"; "[i]n the Siskiyou Mountains, large witch's brooms [created by mistletoe infections] serve as nest platforms for spotted owls and raptors"); AR-2291 (for the Great Gray Owl, a survey and manage species, "mistletoe clumps … provide suitable nest structures"); AR-2301-02 (Johnson's Hairstreak, a BLM sensitive species, "spends the majority of its lifecycle high in the canopy of older conifers with mistletoe infection"); AR-2295 (stressing "importance of maintaining "mistletoe" for bushy-tailed woodrat, prey for the listed northern spotted owl); AR-2289 ("the best quality [Nesting, Roosting, Foraging] habitat [for northern spotted owls] has forest stands with … mistletoe platforms"); AR-2307 (mistletoe can cause "[n]atural mortality," creating snags and coarse woody material); AR-13109 ("Forest pathogens [including mistletoe infections] probably contribute more to diversity in forest structure and the landscape pattern of the

watershed than fire.”).

Despite these undeniable benefits, BLM fails to take a hard look that is proportionate to the resource’s significance. See 40 C.F.R. § 1502.2(b) (“Impacts shall be discussed in proportion to their significance”). Instead, BLM’s disclosures are generalized and vague, stating: “[g]iven that mistletoe removal will occur only occasionally throughout this project, the overall effects of such removal are anticipated to be small.”[3] AR-2294. Without some estimate of the number of trees to be removed, BLM is asking this Court to take its word that only a minimal number of trees with mistletoe will be removed. However, the Ninth Circuit has noted that courts do not simply take an agency’s “word for it and not question their conclusory assertions.” Barnes v. U.S. Dep’t of Transp., 655 F.3d 1124, 1131 (9th Cir. 2011) (the agency’s word “is not entitled to the significant deference” courts give to agency methodology). BLM cannot know that the impact will be small until it has collected and disclosed some information on the number of such trees to be removed or the site-specific impacts of their removal. BLM thus failed to take a hard look at the environmental impacts because it has “improperly minimize[d] negative side effects” of logging trees with mistletoe. Earth Island Inst., 442 F.3d at 1159.

The Magistrate erred because he accepted the agency’s unfounded conclusions that removal would be “limited” and “occur only occasionally” instead of requiring some disclosure related to the impacts from removing untold numbers of trees with mistletoe. Dkt # 83 at 14. BLM only presented conclusions unsupported by *any* information that would allow the decision-

[3] Contradicting its claim that removal of trees with mistletoe will occur only occasionally, BLM concedes that it will not only remove trees with visible mistletoe infections, but also those that have no visible signs of infection: treatment will “remove the trees that might have ‘latent infections,’ due to their proximity of trees with visual symptoms.” AR-2392 (emphasis added). Practically speaking, any tree – whether it is apparently infected or not – can be removed under BLM’s proposal. Without some estimation of the number of these trees to be removed, there is no limitation on what trees can be logged.

maker and the public to gauge the impacts. If BLM had provided, at the very least, an estimate of the number of trees with mistletoe that would be removed, then the impacts from removing trees with mistletoe could be brought into perspective.

Finally, the Magistrate appears to have misunderstood Plaintiffs argument when he states: "Plaintiffs argue that there is no basis for this conclusion because the EA does not state the specific number or location of mistletoe-infected trees that will be logged." Dkt # 83 at 12; *id.* at 13 ("arguing that the BLM should have specified the number of trees that would be harvested"); ("providing a hard number of trees to be logged is not practical"); *id.* at 14 ("The BLM was not required to provide a specific number of mistletoe-infected trees that would be harvested"). Plaintiffs do not contend that a specific number is required, but Plaintiffs do contend that *some* information must be disclosed to allow the decision-maker and the public to understand and gauge the impacts of removing trees with mistletoe. Otherwise, the potential for significant impacts is shrouded in mystery. Here, Plaintiffs were required to simply accept BLM's word that only a "small" number of trees with mistletoe would be removed without even an estimate of the number of trees that would be removed.

III.    BLM failed to adequately disclose the cumulative effects from surrounding timber sales

An EA's analysis of cumulative impacts must "be of high quality." 40 C.F.R. § 1500.1; Kern v. Bureau of Land Mgmt., 284 F.3d 1062, 1076 (9th Cir. 2002) ("Given that so many more EAs are prepared than EISs, adequate consideration of cumulative effects requires that EAs address them fully.") (emphasis in original). NEPA defines a cumulative impact as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7; Or. Natural Res. Council v. Bureau of Land Mgmt., 470 F.3d 818, 822 (9th Cir. 2006); Ocean Advocates v. U.S. Army Corps of Eng'nrs, 361 F.3d 1108, amended op 402 F.3d 846, 868 (2004) (discussing cumulative impacts requirement). The agency's analysis "must be more than perfunctory …" Kern, 284 F.3d at 1075, and requires "some quantified or detailed information …." Ocean Advocates, 361 F.3d at 1128, amended op, 402 F.3d at 868. "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." Id.; see also Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 810 (9th Cir. 1999) (cumulative effects analysis must contain "sufficient detail" so as to be "useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts") (internal citations omitted). In Klamath-Siskiyou Wildlands Ctr. v. BLM, this Court held that:

> Cumulative impacts of multiple projects can be significant in different ways. The most obvious way is that the greater total magnitude of the environmental effects … may demonstrate by itself that the environmental impact will be significant. Sometimes the total impact from a set of actions may be greater than the sum of the parts.

387 F.3d 989, 994 (9th Cir. 2004).

Here, despite the fact that the Sampson Cove timber sale is both overlapping and adjacent to the Cottonwood timber sale, Dkt # 83, BLM only considered cumulative effects related to hydrology, special status plans and noxious weeds, and the northern spotted owl, to the exclusion of all other issues. See Dkt # 83. The EA's alleged cumulative effects analysis for the Sampson Cove timber sale contains neither detailed nor quantitative information, only conclusory assertions. See Neighbors of Cuddy Mountain, 137 F.3d at 1379 ("some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the [the agency's] decisions, can be assured that the [agency] provided the hard look that it is required to provide"). This truncated analysis could not have been envisioned by the

Ninth Circuit when it held that "adequate consideration of cumulative effects requires that EAs address them fully." Kern, 284 F.3d at 1076. BLM's decision to limit its analysis of cumulative effects for an adjacent and overlapping timber sale was, therefore, arbitrary and capricious.

BLM also narrowly defined the analysis area for cumulative effects, thus precluding consideration of impacts from other nearby timber sales. "The total size of the [Cottonwood] analysis area [i.e. the 4 HUC 7s] is 12,892 acres or approximately 20 square miles." AR-2286. The Sampson Cove timber sale is immediately adjacent to the Cottonwood timber sale, yet the BLM argues that it is "outside the analysis area." AR-2382. To the contrary, the Sampson Cove timber sale "neighbors" the Cottonwood timber sale, "with approximately 6 acres overlapping into the Cottonwood analysis area along the drainage divide from the Bear Creek Watershed into the Keene Creek subwatershed." AR-2249.

Furthermore, the agency's scope of analysis for cumulative effects is flawed because the fisher, which has been detected in the analysis area, has a home range that includes surrounding timber sales, including the adjacent Sampson Cove timber sale. See AR-2297 (average home range of the fisher is "approximately 36 sq. km. for an adult male and approximately 11 sq. km. for an adult female…."). A document in the record suggests that the BLM considers cumulative impacts across a species' range, AR-1358 (referencing another project in the Illinois Valley and stating that "effects to spotted owls and their habitat were analyzed across their range") (emphasis added), and, even for the Cottonwood timber sale, the BLM purports to address the home range of northern spotted owls: "the Sampson Cove Project was designed to maintain existing spotted owl, nesting, roosting, foraging, and dispersal habitat within the home ranges of known spotted owl sites, …." AR-2304 (emphasis added). BLM, however, failed to include the home range of the fisher in its cumulative effects analysis. Therefore, the agency did not "show

that it considered the relevant factors," one of which is the home range of the Pacific fisher. Native Ecosystems Council, 304 F.3d at 902. Therefore, BLM's failure to adequately disclose cumulative effects from nearby and surrounding timber sales and BLM's narrowly defined cumulative effects analysis area are arbitrary and capricious.

IV.  The Cottonwood timber sale violates FLPMA by contributing to the need to list the Pacific fisher and failing to contribute to its recovery

The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, requires BLM to prepare RMPs for the various districts under its control. See 43 U.S.C. § 1712. FLPMA and its implementing regulations require BLM to manage lands in compliance with the requirements of the RMP. 43 U.S.C. § 1732(a); see also 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions . . . shall conform to the approved plan."). The Medford RMP requires BLM to "[m]anage for the conservation of Federal candidate and Bureau-sensitive species and their habitats so as not to contribute to the need to list and to contribute to the recovery of the species." AR-22770.

The Pacific fisher is a candidate for listing as "endangered" under the Endangered Species Act due to substantial declines and continued uncertainty about the viability of the West Coast distinct population segment. See AR-9138-9160 (finding the listing of the West Coast distinct population of the fisher warranted but precluded by pending proposals). BLM has "detected fishers within the [Cottonwood] analysis area in the vicinity of Hyatt Reservoir," AR-2290, but concedes that "[t]he extent (dispersal, foraging, or breeding) to which the Cottonwood project area is used by fisher is not known," id.

Here, the Project will adversely impact the fisher by contributing to or acting as a factor in the destruction, modification, and/or curtailment of its habitat through timber harvest, fuels

reduction, and road construction.[4] 16 U.S.C. § 1533(a)(1)(A) (destruction, modification, or curtailment of a species habitat or range is a factor used to determine whether to list a species under the ESA).

A. Using northern spotted owl habitat as a proxy for fisher habitat is arbitrary

The Magistrate concluded that BLM's use of northern spotted owl habitat as a proxy for fisher habitat was permissible because both animals prefer old-growth habitat. Dkt # 83 at 20. Despite a general preference for similar habitat, the Cottonwood EA makes specific disclosures about impacts to the fisher that do not also apply to the northern spotted owl. For example, as noted above, the EA concedes that road construction will "remove existing forest and contribute to the fragmentation of habitat used by the fisher," AR-2298, but no similar impact is disclosed for the northern spotted owl, AR-2297 (impacts to northern spotted owl from road construction only include "noise disturbance, increased potential for over hunting along roads due to easy access, and microclimatic changes to the habitat adjacent to roads"). This makes sense, since owls can fly over roads and fisher, as a terrestrial mammal, cannot.[5] Under BLM's proxy approach, the impacts disclosed in the EA should be the same, but the EA discloses different impacts to these two species from road construction.

BLM's reliance on northern spotted owl habitat as a proxy for fisher habitat is also puzzling given that BLM has now detected fishers in the project area. The rationale for using the proxy method was sanctioned in a lower court case from 2007 where fisher had only been detected once in "the Rogue River watershed in the last 11 years" and "plaintiffs [had] not

[4] "Contribute" means "to help bring about as a result; act as a factor." American Heritage Dictionary, 410 (3d ed. 1992); Martin, 479 F.3d at 642 (applying plain meaning of undefined term in forest plan). The Magistrate failed to consider the plain meaning of the term "contribute" in the F&R.

[5] The Magistrate acknowledges this fundamental difference when it states that the "fisher prefers forest floors with large amounts of coarse woody debris and snags, which fisher use for dens, and areas with significant canopy closure." Dkt # 83 at 21.

pointed to evidence that any fishers actually live[d] in the Project area." See Dkt # 38-2 at 13. Neither of those distinguishing factors exists here, and it was error for the Magistrate to ignore the impacts to the fisher that will contribute to its listing under the ESA.

B. Timber harvest and fuels reduction contribute to the need to list the fisher

The Magistrate also erred by ignoring the threats outlined below that would contribute to the need to list the fisher under the plain meaning of the word "contribute." The EA concedes that "[m]ajor threats that fragment or remove key elements of fisher habitat include various forest vegetation management practices such as timber harvest and fuels reduction treatments." AR-2290; AR-9146 ("Timber harvest can fragment fisher habitat, reduce it in size, or change the forest structure to be unsuitable for fishers."). It is undisputed that the Project contains both of these "major threats." See AR-2201, 2211-12.

Timber harvest and fuels reduction will also adversely affect the fisher's prey, one of two "critical features that explain fisher habitat use,…." AR-9141. BLM concedes impacts to fisher prey, but attempts to dilute those impacts over time: "Thinning treatments would have short term adverse effects to habitat for some fisher prey species due to the reduced vegetation. These effects are relatively short term, as understory vegetation typically returns within 5 years." AR-2297. The EA does not cite to any authority in FLPMA that permits a short-term or *de minimis* violation of the RMP if it is allegedly cured sometime in the future. To the contrary, this Court has determined that the National Forest Management Act (NFMA) does not contain a *de minimis* exception, see Or. Nat. Res. Council v. Goodman, 505 F.3d 884, 895 (9th Cir. 2007) (finding violation of forest plan and concluding that NFMA "contains no *de minimis* exceptions"), and there is no reason FLPMA would allow for such an exception. See Kern v. BLM, 284 F.3d 1062, 1070 (9th Cir. 2002) ("FLPMA is the equivalent, in this case, to NFMA in Ohio

Forestry"). It is, therefore, undisputed that for the next five years, the fisher will be adversely affected by reduced prey from timber harvest and fuels reduction.

C. Road construction contributes to the need to list the fisher

The EA also concedes that "[a]bout 2.1 miles of new road would be constructed. Some of this road construction will remove existing forest and contribute to the fragmentation of habitat used by the fisher."[6] AR-2298 (emphasis added); AR-9146 ("Habitat fragmentation has contributed to the decline of fisher populations …."); id. (U.S. Fish and Wildlife Service finding that fishers are "reluctant to cross open areas to recolonize historical habitat").[7] Thus, the project will contribute to the need to list the fisher in violation of the RMP and FLPMA.

The Magistrate acknowledged that "features of past timber harvest, such as clear-cutting, broadcast burning, and poor road placement in past timber harvests caused habitat damage." Dkt # 83 at 21. However, the current project activities, including road construction, will also damage habitat, including fragmentation and removal of habitat. AR-2298. Fragmentation and removal of fisher habitat "contribute" to the need to list the fisher because it destroys, modifies, or curtails the fisher's habitat. The Magistrate also found that "some fragmentation [of the fisher's habitat] will occur in the short term," but the Magistrate nonetheless found that the timber sale will contribute to the recovery of the fisher. Dkt # 83 at 23. As noted above, however, FLPMA contains no *de minimis* exception for which short term harm can be excused. See Or. Nat. Res. Council, 505 F.3d at 895. Because the Magistrate agreed that there would be harm to the fisher, that harm contributes to the need to list the fisher. Therefore, the Magistrate erred in finding that the Cottonwood timber sale would contribute to the recovery of the fisher.

---

[6] In the DR, this was reduced to 1.75 miles, including 1.15miles of permanent and 0.6 miles of temporary construction.

[7] The Project will also reconstruct roads that "have become overgrown due to years of non-use," AR-4599, which will further fragment fisher habitat.

      D. Reducing canopy cover contributes to the need to list the fisher

The Magistrate also concluded that because the Cottonwood timber sale will retain 60% canopy cover in northern spotted owl nesting, roosting, and foraging habitat and 40% canopy cover in dispersal habitat, the timber sale will not contribute to the need to list the fisher. Dkt # 83 at 22. This assumption is based on a direct correlation between canopy cover for northern spotted owl and fisher, but Plaintiffs cited to numerous documents in the record indicating that Pacific fisher requires a much greater degree of canopy closure than is provided by the Cottonwood timber sale. See AR-9141 ("[i]n the Klamath and north coast regions of California, Carrol *et al*. (1999) also found a strong association [of fisher] with high levels of tree canopy cover, tree size class, and percent conifer"); AR-9141-9142 ("greater than 50 percent canopy cover" and "greater than 60 percent canopy cover"); AR6369 ("[w]ithin low and mid-elevation forests, the most consistent predictor of fisher occurrence at large spatial scales was moderate to high amounts of contiguous canopy cover rather than any particular forest plant community" and "empirical evidence suggests that fishers generally have a positive association with increasing canopy cover at all spatial scales investigated …."); AR-6763 ("On average, 66% of the area within fisher home ranges in the southern Sierra Nevada was composed of forests with 60-100% canopy cover and an additional 22% had canopy cover of 40-59% (Study Area 25)"); *id*. ("[m]ost fisher locations were in dense forest stands with > 76% canopy cover; stands with <50% canopy cover were avoided"). Thus, reductions in canopy cover will contribute to the need to list the fisher.

E. Removal of trees with mistletoe contributes to the need to list the fisher

The Magistrate also erred in finding that removing trees with mistletoe, a primary habitat component utilized by the fisher, would not contribute to the need to list the fisher. See AR-

6384 ("In several studies, fisher rest sites were positively associated with the abundance of trees that had rust brooms and mistletoe …, which are structural features that provide rest platforms for fishers"); AR-6385 ("When resting in live trees, fishers were observed using deformities associated with mistletoe and broom rust infections, …."); id. ("In more northern study areas, fishers primarily rested in live conifer trees with rust brooms … or mistletoe brooms and other platforms…."); AR-6394 ("Within each locality, the species of live trees and snags that are most likely to develop rust brooms, mistletoe brooms, platforms, or cavities appear to be more important [to the fisher] than those that do not …."); AR-5539 ("Rest site structures used by fishers include: cavities in live trees, snags, hollow logs, fallen trees, canopies of live trees, platforms formed by mistletoe ("witches broom") [*sic*] …."); id. ("The majority of 34 [fisher] resting sites described by Self and Kerns (2001) were located in mistletoe brooms in live Douglas-firs, whereas only 20 percent were in snags or hardwoods."). Most importantly, BLM failed to consider whether the removal of unknown amounts of mistletoe would contribute to the need to list the fisher, and, therefore, the agency's conclusion is arbitrary and capricious.

## CONCLUSION

Based on these objections, Plaintiffs respectfully request that this Court overturn the Magistrate's F&R with regard to Plaintiffs' claims discussed above, and enter Summary Judgment in favor of Plaintiffs on these claims.

Respectfully submitted June 26, 2013.

s/ Sean T. Malone
Sean T. Malone, OSB # 084060
Attorney for Plaintiffs
259 E. 5th Ave., Ste 200-G
Eugene OR 97401
(303) 859-0403

                                                                       Marianne Dugan, OSB # 93256  
                                                                       Attorney for Plaintiffs  
                                                                       259 E. 5th Ave., Ste 200-D  
                                                                       Eugene, Oregon 97401  
                                                                       (541) 338-7072

**Certificate of Service**

   I hereby certify that on June 26, 2013 Plaintiffs filed through the United States District Court ECF System the foregoing to be served by CM/ECF electronic filing on the following attorneys of record:

Michael E. Haglund
Haglund Kelley Jones & Wilder
200 SW Market St. Ste 1777
Portland OR 97201
Ph. 503.225.0777
Fax 503.225.1257
haglund@hk-law.com

Alison Garner
U.S. Department of Justice
Environment and Natural Resources Division
PO Box 7611
Washington DC 20044-7611
Ph. 202.514.2855
Fax. 202.305.0506

Jason Hill
U.S. Department of Justice
Environment and Natural Resources Division
PO Box 7611
Washington DC 20044-7611
Ph. 202.514.1024
Fax. 202.305.0506

        /s/ Sean T. Malone
        Sean T. Malone
        *Attorney for Plaintiffs*